# EXHIBIT A



# CAREPATROL FRANCHISE AGREEMENT

FRANCHISEE: Hercules Bothma & Michaela Kulbartz - Sustained Care Services, LLC

DATE: 4/22/2019

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

# TABLE OF CONTENTS

1.    GRANT OF FRANCHISE ........................................................................................... 1

2.    TERRITORY ............................................................................................................... 1

3.    TERM AND RENEWAL ............................................................................................ 2

4.    TRAINING, CONFERENCES, AND MEMBERSHIPS ............................................ 3

5.    OTHER FRANCHISOR ASSISTANCE. .................................................................. 5

6.    ESTABLISHING YOUR BUSINESS ....................................................................... 6

7.    MANAGEMENT AND STAFFING ........................................................................... 6

8.    FRANCHISEE AS ENTITY ....................................................................................... 6

9.    FRANCHISE OWNER AGREEMENT ...................................................................... 6

10.  ADVERTISING & MARKETING. ........................................................................... 7

11.  OPERATING STANDARDS. .................................................................................... 8

12.  MINIMUM PERFORMANCE REQUIREMENTS ................................................. 10

13.  FRANCHISE ADVISORY BOARD ........................................................................ 11

14.  FEES ........................................................................................................................ 11

15.  BRAND PROTECTION COVENANTS. ................................................................. 13

16.  YOUR OTHER RESPONSIBILITIES ..................................................................... 15

17.  INSPECTION AND AUDIT ..................................................................................... 17

18.  INTELLECTUAL PROPERTY ............................................................................... 18

19.  INDEMNITY. ........................................................................................................... 19

20.  TRANSFERS ............................................................................................................ 20

21.  TERMINATION ....................................................................................................... 22

22.  POST-TERM OBLIGATIONS. ................................................................................ 23

23.  DISPUTE RESOLUTION ........................................................................................ 24

24.  YOUR REPRESENTATIONS ................................................................................. 25

25.  GENERAL PROVISIONS ........................................................................................ 26

ATTACHMENTS

ATTACHMENT "A"    Territory
ATTACHMENT "B"    Franchise Owner Agreement
ATTACHMENT "C"    ACH Authorization Form
ATTACHMENT "D"    Brand Protection Agreement
ATTACHMENT "E"    HIPAA Business Associate Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

**CAREPATROL FRANCHISE AGREEMENT**

This CarePatrol Franchise Agreement (this "Agreement") is entered into as of __4/22/2019__ (the "Effective Date") by and between CarePatrol Franchise Systems, LLC, a Delaware limited liability company ("we," "us," or "CarePatrol") and Sustained Care Services, LLC , a Pennsylvania limited liability company, and as individuals, Hermosa Bothma & Michaela Kulbartz (hereinafter, together "you" or "Franchisee").

1. **GRANT OF FRANCHISE**. We hereby grant you a license to own and operate a CarePatrol business (your "Business") using our Intellectual Property solely within the geographic area identified in ATTACHMENT "A" (your "Territory"). As a CarePatrol franchisee, you will establish and operate a business under the name "CarePatrol" that provides senior living placement, referral and consulting services for families in need of independent living community, assisted living community, memory care, nursing home, or similar facility for the seniors in their lives.

2. **TERRITORY**.

    **2.1.** **Description.** We will grant you certain territorial rights associated with your Territory, as further described in Section 2.3.

    **2.2.** **Operating Within Your Territory**. Except as otherwise provided in this Section, you will conduct your Business solely within your Territory and all of your marketing activities must be directed within your Territory. You cannot solicit clients or tour facilities outside of your Territory. You may provide placement services to clients who reside outside of your Territory if: (i) the client is solicited by you while inside your Territory; or (ii) the client is specifically referred to you by one of your other clients or other referral sources. You may not tour facilities located outside of your Territory in open (unsold) territories unless you receive our prior written permission. You may not tour facilities located outside of your Territory in territories that have been granted to another franchisee unless you receive either our, or that franchisee's, prior written permission. If we authorize you to operate in an area outside of your Territory and that area is subsequently operated by us or awarded to another franchisee, then you must immediately transition all customers, contracts and accounts to the new Franchisee or us (as applicable), after which point you will not be entitled to further compensation from the assigned customers, contracts and accounts.

    **2.3.** **Territorial Rights**. During the Term, you will have: (i) exclusive right to market placement services to all medically related businesses in your Territory, such as nursing homes, home health agencies, non-medical home care agencies, hospitals, doctors offices, and hospices; (ii) the exclusive right to conduct tours of facilities located in your Territory; and (iii) the exclusive right to place clients in facilities that are located in your Territory (unless you provide your permission for us or another franchisee to place a client and/or tour a facility in your Territory). Neither we nor any other franchisee may actively solicit clients from within your Territory. However, National Leads, Partner Facilities, Community Integration Model Leads, and passive solicitations (as defined herein) shall not be deemed an active solicitation of clients within your Territory. Notwithstanding the rights listed above, we reserve the right to: (i) offer and sell products and services similar to those provided by the Business via alternative channels of distribution, including, but not limited to, sales through the Internet and other channels of e-commerce; (ii) establish and operate, and license others the right to establish and operate, Businesses using the marks and system at any location outside of a franchisee's territory; (iii) establish and operate, and grant others the right to establish and operate, businesses that offer similar products to those offered by the Business under any other mark other than Marks at any location; (iv) acquire, or be acquired by, any company, including a company operating one or more businesses offering products or services similar to those offered by the Business, in any location; and (v) use the Marks and System, and license others to use the Marks and System, to engage in any other activities not expressly prohibited by the Franchise Agreement.

    **2.4.** **Loss of Territorial Rights**. If you fail to meet the Minimum Performance Requirement specified in Section 12, we may terminate your territorial rights, in which case we and other franchisees shall have the unrestricted right to operate a CarePatrol business within your Territory. Instead of terminating your territorial

1

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

rights, we reserve the right to either (i) terminate this Agreement if you fail to meet the minimum performance criteria, (ii) refuse to enter into a renewal franchise agreement with you upon the expiration of the Term, or (iii) reduce the size of your Territory.

## 3.    TERM AND RENEWAL

**3.1.    Term; Franchisee's Right to Renew**.  The term of this Agreement will begin on the Effective Date and expire five (5) years thereafter (the "Term").  At time of expiration of this Initial Term, CarePatrol, in its sole discretion, may provide you with the right to renew the Franchise for an additional term equal to the then customary Initial Term as is granted under CarePatrol's then current form of the Franchise Agreement. Additionally, CarePatrol may grant you a renewal agreement, if during the Initial Term of this Agreement you have substantially complied with all material provisions of the Agreement and you agree to comply with the specifications and standards applicable for Newly Franchised CarePatrol Businesses at the time of expiration of this agreement. REDACTED - Confidential and Proprietary

**3.2.    Notice of Renewal and Nonrenewal.** You shall give us written notice of your desire to exercise your option to renew at least 180 days before the expiration of this Agreement.  If we determine that you do not have the right to renew the Franchise, we agree to give you written notice of our determination at least 120 days before the expiration of this Agreement.  A notice of nonrenewal from us will state the reasons for our refusal to renew. If we determine, in our sole discretion, that the reasons cited for nonrenewal are deemed curable, and are then cured you, within the cure period stated in the notice or within sixty (60) days of the date of our notice of nonrenewal, you will be allowed to renew as described in this section.  If, however, we deem the reasons stated for nonrenewal as not curable, or if curable reasons are not cured within the cure period, the Franchise granted by the Agreement shall not be renewed and will expire at the end of the Initial Term and be subject to this section. The reasons stated for nonrenewal which are curable, include, without limitation, the insolvency of you, the occurrence of an assignment for the benefit of creditors by you or your filing of a petition of bankruptcy or your failure during the Initial Term to comply with directives of CarePatrol or with our standards. In the event of a nonrenewal for any reason, either because you have not exercised you option to renew or CarePatrol has determined that you may not renew, you shall thirty (30) days prior to the expiration of the Initial Term provide CarePatrol with a complete list of customers of the Business.

**3.3.    Renewal Agreements.** To renew the Franchise, CarePatrol and you (and the owners of Franchisee, if Franchisee is a corporation) shall execute the form of and be bound by the franchise agreement and ancillary agreements CarePatrol customarily uses, at that time, in the grant of franchises for the ownership and operation of a CarePatrol Business, which agreement supersedes this Agreement and any ancillary documents in all respects and terms of which agreements may differ from the terms of this Agreement.  Additionally, you, and all owners of the Business, must sign a general release of claims in the form designated by us. "General Release" means our current form of general release of all claims against us and our affiliates and subsidiaries, and our and their respective members, officers, directors, agents and employees, in both their corporate and individual capacities.   Failure by you sign agreement(s) within 30 days after delivery is deemed an election by you not to renew the Franchise.

**3.4.    Conditions for Renewal.** In addition to the conditions and requirements stated above in this Section, any or all of the following conditions shall be met by you, at CarePatrol's sole discretion, before and at the time of renewal:

(a)    You are not to be in default of any provision of this Agreement, any amendment or successor or any other agreement between the parties or any of CarePatrol affiliates; and you have substantially and timely complied with all the terms and conditions of all agreements;

(b)    You have satisfied all monetary obligations owed by you to CarePatrol and its affiliates under this Agreement and any other agreement between you and any of CarePatrol's affiliates and have met those obligations in a timely manner throughout the terms of those agreements; and

2

(c)     You must comply with CarePatrol's then-current qualification and training requirements including attending CarePatrol's then current training program.

**3.5.**     <u>**Expired Agreement**</u>. If you do not sign a new Franchise Agreement or do not initiate and comply with the renewal procedures outlined in this section, prior to the expiration of this Agreement and continue to accept the benefits of this Agreement after the expiration of this Agreement, then at the option of CarePatrol this Agreement may be treated either as: expired as of the date of expiration with you then operating without a right to do so and therefore in violation of CarePatrol's rights; or extended on a month-to-month basis (the "Interim Period") until either party provides written notice of such party's intention to terminate the Interim Period.  Should either party give notice to terminate the Interim Period, the effective date of termination will be thirty (30) days after receipt of the notice.  During any Interim Period, all of your obligations shall remain in full force and effect as if this Agreement had not expired. All obligations and restrictions imposed upon you on the expiration of this Agreement shall be deemed to take effect upon the effective termination of the Interim Period.

**4.     TRAINING, CONFERENCES, AND MEMBERSHIPS**

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

**5.**   **OTHER FRANCHISOR ASSISTANCE.**

**5.1.**   **Manual.** During the Term, we will lend you our confidential Brand Standards Manual (the "Manual") in hard copy or electronic form. The Manual will help you establish and operate your Business. The information in the Manual is confidential and proprietary and may not be disclosed to third parties without our prior approval.

REDACTED - Confidential and Proprietary

**5.3.**   **General Guidance/Additional Guidance.** We will provide our guidance and recommendations on ways to improve the marketing and/or operation of your Business by telephone during normal business hours. If you request additional on-site guidance through field visits by our field representatives, we will charge you the Supplemental Training Fees as stated in Section 4.2 above.

**5.4.**   **Marketing Assistance.** As further described in Section 10.1, we will provide you with certain marketing assistance during the Term.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

**5.6.**   **National Leads**. We will refer you leads that we receive (if any) that relate to placements in your Territory ("National Leads").  A lead is considered a "National Lead" when the client calls the corporate office, regardless of where the lead was originally generated.  However, if the lead is already registered in the franchisee database at time of or prior to the lead calling the corporate office, the lead will be considered a lead of the franchisees and not a National Lead subject to the associated referral fees. We may also directly negotiate referral relationships with hospitals, insurance companies, HMO's, transitional care companies or other businesses or institutions that are in a position to refer leads, and any leads generated from any of these sources will be considered leads referred by us for purposes of this Section. You acknowledge that we do not guaranty that you will receive any leads from us and it is your responsibility to generate leads for your Business. Please see Section 14.5 for our fees related to these National Leads.

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

**5.7.** **Purchase Agreements.** We may, but need not, negotiate purchase agreements with suppliers to obtain discounted prices for us and our franchisees. If we succeed in negotiating a purchase agreement, we will arrange for you to be able to purchase the goods directly from the supplier at the discounted prices that we negotiate (subject to any rebates the supplier pays to us). We may also purchase certain items from suppliers in bulk and resell them to you at our cost-plus shipping fees and a reasonable markup.

## 6. ESTABLISHING YOUR BUSINESS

**6.1.** **Office**. A CarePatrol business is a home-based business. You are not required to lease or purchase a separate commercial office in connection with your Business. You may relocate your home-office at any time upon 30 days written notice to us. If you elect to lease commercial office space, it must be centrally located within your territory and you must seek our approval prior to executing a lease. You are responsible for all costs, liability, expense and the responsibility for locating, selecting, procuring, obtaining and developing this space.

**6.2.** **Opening**. You must open your Business to the public within 30 days after completion of Phase Four's Classroom training at our corporate headquarters. You may not open your Business before: (i) successful completion of the full initial training by your Managing Owner; (ii) you purchase all required insurance; and (iii) you obtain all required licenses, permits and other governmental approvals.

## 7. MANAGEMENT AND STAFFING.

**7.1.** **Owner Participation.** You acknowledge that a major requirement for the success of your Business is the active, continuing, and substantial personal involvement and hands-on supervision by your Managing Owner. The Managing Owner must actively manage your Business on a full-time basis, and must hold at least five percent (5%) ownership interest in the franchisee entity, if applicable, as further described below in Section 8. Any new Managing Owner that we approve must successfully complete the initial training program as described in Section 4.1.

**7.2.** **Employees.** You must determine appropriate staffing levels for your Business to ensure full compliance with this Agreement and our system standards. You may hire, train and supervise employees to assist you with the proper operation of the Business. You agree to be solely responsible for all employment decisions and to comply with all state, federal, and local hiring laws and functions of the Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, compensation, promotion, record-keeping, supervision, and discipline of employees, paid or unpaid, full or part-time. Your personnel must be competent, conscientious, and properly trained. Nothing in this Agreement is intended or may be construed to create any type of employer or joint employer relationship between (a) you and/or your personnel, and (b) us." You must ensure that all employees sign the Brand Protection Agreement (ATTACHMENT "D"). In this regard, you must use your legal business entity name (not our Marks or a fictitious name) on all employee applications, paystubs, pay checks, employment agreements, time cards, and similar items You must also post a conspicuous notice for employees in the back-of-the-house area explaining your franchise relationship with us and that you (and not we) are the employee's sole employer. We may prescribe the form and content of this notice.

## 8. FRANCHISEE AS ENTITY. If you are an Entity, you agree to provide us with a list of all of your Owners. *"Entity"* means a corporation, partnership, limited liability company or other form of association. All Owners of the Entity (whether direct or indirect) are jointly and severally responsible for the Entity's performance of this Agreement and each Owner is bound by all of the terms of this Agreement. Upon our request, you must provide us with a resolution of the Entity authorizing the execution of this Agreement, a copy of the Entity's organizational documents and a current Certificate of Good Standing (or the functional equivalent thereof). You represent that the Entity is duly formed and validly existing under the laws of the state of its formation or incorporation.

## 9. FRANCHISE OWNER AGREEMENT. If you are an Entity, all Owners (whether direct or indirect) and their spouses must sign a Franchise Owner Agreement, the current form of which is attached as

6

ATTACHMENT "B".

**10.** **ADVERTISING & MARKETING.**

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

**10.2.** **Your Marketing Activities**.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

(b)  Standards for Advertising. All advertisements and promotions that you create, or use must be completely factual and conform to the highest standards of ethical advertising and comply with all federal, state and local laws. You must ensure that your advertisements and promotional materials do not infringe upon the intellectual property rights of others.

(c)  Approval of Advertising. Before you use them, we must approve all advertising and promotional materials that we did not prepare or previously approve (including materials that we prepared or approved, and you modify). The materials will be deemed disapproved by us if we fail to issue our approval within 30 days after receipt. You may not use any advertising or promotional materials that we have disapproved (including materials that we previously approved and later disapprove).

(d)  Internet and Websites. We do not allow you to maintain your own websites or market your CarePatrol businesses on the Internet or on any social media site, except for any satellite website we provide pursuant to Section 5.5. Moreover: "(i) CarePatrol has established and maintains a website to promote the Marks and/or the System (the "Website"); (ii) CarePatrol will have sole control over all aspects of the Website, and can discontinue operation of the Website at any time without notice to franchisees; (iii) unless you obtain our prior written consent, you are prohibited from establishing or maintaining a separate website or otherwise maintaining another presence on the Internet through any social networking site in connection with the operation of the Franchised Business; (iv) CarePatrol has the right to modify or supplement its policies regarding social media and Internet use at any time in writing, whether as part of the Manuals or otherwise. You must comply with any social media policy that we develop from time to time.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

## 11. OPERATING STANDARDS.

**11.1.     Generally.** You agree to operate your Business: (i) in a manner that will promote the goodwill of the Marks; and (ii) in full compliance with our standards and all other terms of this Agreement and the Manual. You and your employees must maintain a clean and attractive appearance and provide prompt, courteous and efficient services to the public.

**11.2.     Brand Standards Manual**. You agree to establish and operate your Business in accordance with the Manual. The Manual may contain, among other things: (i) a description of the authorized goods and services that you may offer at your Business; (ii) mandatory and suggested specifications, operating procedures, and quality standards for products, services and procedures that we prescribe from time to time for CarePatrol franchisees; (iii) mandatory reporting and insurance requirements; and (iv) a written list of goods and services (or specifications for goods and services) you must purchase for the development and operation of your Business and a list of any designated or approved suppliers for these goods or services. The Brand Standards Manual is designed to establish and protect our brand standards and the uniformity and quality of the goods and services offered by our franchisees We can modify the Manual at any time. The modifications will become binding 30 days after we send you notice of the modification. You must comply with all mandatory provisions contained in the Manual (whether they are included now or in the future).

**11.3.     Authorized Goods and Services.** You agree to offer all goods and services that we require from time to time in our commercially reasonable discretion. You may not offer any other goods or services at your Business without our prior written permission. You may not use your business or permit your business to be used for any purpose other than offering the goods and services that we authorize. We may, without obligation to do so, add, modify or delete authorized goods and services, and you must do the same upon notice from us. Our addition, modification or deletion of one or more goods or services shall not constitute a termination of the Franchise or this Agreement.

**11.4.     Suppliers and Purchasing.** You agree to purchase or lease all products, supplies, equipment, services and other items specified in the Manual from time to time. If required by the Manual, you agree to purchase certain goods and services only from suppliers designated or approved by us (which may include, or be limited exclusively to, us or our affiliate). You acknowledge that our right to specify the suppliers that you may use is necessary and desirable so that we can control the uniformity and quality of goods and services used, sold or distributed in connection with the development and ongoing operation of CarePatrol businesses, maintain the confidentiality of our trade secrets, obtain discounted prices for our franchisees if we choose to do so, and protect the reputation and goodwill associated with the System and the Marks. If we receive rebates or other financial consideration from these suppliers based upon franchisee purchases, we have no obligation to pass these amounts on to you or to use them for your benefit. If you want us to approve a supplier that you propose, you must send us a written notice specifying the supplier's name and qualifications and provide any additional information that we request. We will approve or reject your request within 30 days after we receive your notice and all additional information (and samples) that we require. However, approval of non-approved suppliers will be deemed automatically denied if we do not respond within the 30-day window. You must reimburse us for all costs and expenses that we incur in reviewing a proposed supplier within 10 days after invoicing.

8

**11.5.** **Email.** You must exclusively use the CarePatrol.com domain name that we assign to you for all correspondence between you and our clients and senior care facilities. You must save all emails on the CarePatrol server that are sent to your CarePatrol.com domain name. Your Technology Fee will include two (2) company email addresses per territory. REDACTED - Confidential and Proprietary

**11.6.** **Entry of Client Data.** All business activities must be immediately entered into Calculated Care. Any new activity must be entered as it occurs to maintain the most accurate data.

**11.7.** **National Lead Management.** If we refer a National Lead, as defined in Section 5.6 above, to you, you must contact the lead within the minimum period of time, and in accordance with our standards, specified in the Manual. If you fail to do so, we may pursue and place the lead ourselves without being deemed to violate your territorial rights and you will not be entitled to any compensation relating to the placement. If you repeatedly fail to contact referred leads within the minimum period of time and/or in accordance with our standards specified in the Manual, we may cease referring leads to you until such time that you are re-trained by us at our discretion at corporate headquarters or another location of our choosing. We will not impose a fee for any such training, but you are responsible for all costs and expenses you incur.

**11.8.** **Equipment Maintenance and Changes.** You agree to maintain all of your equipment in good condition and promptly replace or repair any equipment that is damaged, worn-out or obsolete. You are solely responsible for taking reasonable steps to protect your computer from viruses, computer hackers and other computer related problems (i.e., firewalls, access code protections, anti-virus systems and backup systems). We may require that you change your equipment, which may require you to make additional investments. You acknowledge that our ability to require franchisees to make significant changes to their equipment is critical to our ability to administer and change the System and you agree to comply with any such required change within the time period that we reasonably prescribe.

**11.9.** **Software and Technology.**

# REDACTED - Confidential and Proprietary
# REDACTED - Confidential and Proprietary
# REDACTED - Confidential and Proprietary
# REDACTED - Confidential and Proprietary

(b) **Additional Software.** We may change the software or technology that you must use at any time. We may also develop new proprietary software or technology that must be used by CarePatrol franchisees. If this occurs, you agree to enter into a license agreement with us (or an affiliate of ours) and pay us (or our affiliate) commercially reasonable licensing, support and maintenance fees. The terms of the license agreement will govern the terms pursuant to which you may utilize this software or technology. We also reserve the right to enter into a master software or technology license agreement with a third-party licensor and then sublicense the software or technology to you, in which case we may charge you for all amounts that we must pay to the licensor based on your use of the software or technology. All fees referenced in this Section are due 10 days after invoicing or as otherwise specified by us from time to time.

(c) **Accounting Software.** You are required to use the latest version of the QuickBooks Online ("QBOE") Business Package. You are responsible for any fees associated with the use of QBOE. We, in our sole and absolute discretion, reserve the right to change the required accounting software, upon 90 day written notice. In the event we elect to utilize an alternative to the QBOE accounting system, you are responsible

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

to pay the new approved supplier any initial license fee and ongoing monthly license and/or maintenance fees it may require.

**11.10.** __Hours of Operation.__ Your Business must be open Monday through Friday from, at least, 8:00 a.m. to 5:00 p.m., your local time. You agree to use your best efforts to have the Business' telephone answered by a live person during the normal daytime working hours. However, in order to accommodate our clients who may require assistance or have emergency situations that occur outside normal business hours, you will implement a program to manage after business hours phone coverage.

**11.11.** __Client Complaints.__ If you receive a client complaint, you must follow any complaint resolution process that we specify to protect the goodwill associated with the Marks.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

Your failure to meet these minimum performance requirements constitutes a material default under your Franchise Agreement, permitting us to terminate your franchise, refuse to enter into a renewal agreement with you, reduce the size of your territory, or terminate your territorial rights.

(a)     If this Agreement is the result of a transfer, the Minimum Performance Standard under the new franchise agreement will be the: Minimum Performance Requirements the transferring franchisee has obtained or the Minimum Performance Requirements the transferring franchisee was required to obtain during the previous year of operation, whichever is greater.

(b)     If this Agreement is the result of a renewal of a previous franchise agreement, the Minimum Performance Standard under the new franchise agreement will be the: Minimum Performance Standards the renewing franchisee has obtained or the Minimum Performance Standards of a franchisee in its fourth year of operation, whichever is greater.

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

**13.** **FRANCHISE ADVISORY BOARD.** We have created a Franchise Advisory Board also referred to as the Advisory Board, to provide us with suggestions to improve the System, including matters such as marketing, operations and new product or service suggestions. We will consider all suggestions from the Advisory Board in good faith, but we are not bound by any such suggestions. The Advisory Board operates according to rules and regulations we periodically specify, including procedures governing the selection of representatives of the Advisory Board.

**14.** **FEES**

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

Section 14.8 shall not constitute our agreement to accept the late payments after same are due, or a commitment by us to extend credit to or otherwise finance the operation of your Business.

**14.9.** **Method of Payment.** You must complete and send us an ACH Authorization Form allowing us to electronically debit a banking account that you designate (your "Account") for: (i) all fees payable to us pursuant to this Agreement (other than the initial franchise fee); and (ii) any amounts that you owe to us or any of our affiliates for the purchase of goods or services. We will debit your Account for these payments on or after the due date. Our current form of ACH Authorization Form is attached to this Agreement as ATTACHMENT "C." You must sign and deliver to us any other documents that we or your bank may require authorizing us to debit your Account for these amounts. You must deposit into the Account all revenues that you generate from the operation of your Business. You must make sufficient funds available for withdrawal by electronic transfer before each due date. If there are insufficient funds in your Account to cover all amounts that you owe, any excess amounts that you owe will be payable upon demand, together with any late charge imposed pursuant to Section 14.8. At our option, we may require that you make payments to us in another manner, such as by check.

**14.10.** **Application of Payments**. We have sole discretion to apply any payments from you to any past due indebtedness of yours or in any other manner we feel appropriate. You may not set off any amounts owed to us due to any alleged non-performance by us or breach of this Agreement by us.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

15. **BRAND PROTECTION COVENANTS.**

**15.1.** **Reason for Covenants**. You acknowledge that the Intellectual Property and the training and assistance that we provide would not be acquired except through implementation of this Agreement. You also acknowledge that competition by you, the Owners or persons associated with you or the Owners (including family members) could seriously jeopardize the entire franchise system because you and the Owners have received an advantage through knowledge of our day-to-day operations and Know-how related to the System. Accordingly, you and the Owners agree to comply with the covenants described in this Section to protect the Intellectual Property and our franchise system.

**15.2.** **Our Know-how**. You and the Owners agree: (i) neither you nor any Owner will use the Know-how in any business or capacity other than the operation of your Business pursuant to this Agreement; (ii) you and the Owners will maintain the confidentiality of the Know-how at all times; (iii) neither you nor any Owner will make unauthorized copies of documents containing any Know-how; (iv) you and the Owners will take all reasonable steps that we require from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you and the Owners will stop using the Know-how immediately upon the expiration, termination or Transfer of this Agreement, and any Owner who ceases to be an Owner before the expiration, termination or Transfer of this Agreement will stop using the Know-how immediately at the time he or she ceases to be an Owner.

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

**15.3.    Unfair Competition During Term**. You and your Owners agree not to unfairly compete with us during the Term by engaging in any of the following activities ("Prohibited Activities"): (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in any Competitive Business, other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business; (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); or (iii) inducing (a) any of our employees or managers (or those of our affiliates or franchisees) to leave their position or (b) any client of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours. *"Competitive Business"* means any business that provides senior referral and placement services similar to or competitive with the services offered by CarePatrol businesses as well as any form of ownership in a senior care facility or home care agency without our express written approval.

**15.4.    Unfair Competition After Term**. During the Post-Term Restricted Period, you and your Owners agree not to engage in any Prohibited Activities. Notwithstanding the foregoing, you and your Owners may have an interest in a Competitive Business during the Post-Term Restricted Period as long as the Competitive Business is not located within and does not provide competitive goods or services to clients who are located within, the Restricted Territory. *"Restricted Territory"* means the geographic area within: (i) your Territory; and (ii) any territory operated by us or another CarePatrol franchisee as of the beginning of the Post-Term Restricted Period (we will provide you with a description of all such territories upon your written request); provided, however, that if a court of competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within your Territory. If you or an Owner engages in a Prohibited Activity during the Post-Term Restricted Period (other than having an interest in a Competitive Business that is permitted under this Section), then the Post-Term Restricted Period applicable to you or the non-compliant Owner, as applicable, shall be extended by the period of time during which you or the non-compliant Owner, as applicable, engaged in the Prohibited Activity. *"Post-Term Restricted Period"* means, with respect to you, a period of one (1) year after the termination, expiration or Transfer of this Agreement. "Post-Term Restricted Period" means, with respect to an Owner, a period of one (1) year after the earlier to occur of (i) the termination, expiration or Transfer of this Agreement or (ii) the Owner's Transfer of his or her entire ownership interest in the franchise or the Entity that is the franchisee, as applicable.

**15.5.    Immediate Family Members**. The Owners acknowledge that they could circumvent the purpose of Section 15 by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). The Owners also acknowledge that it would be difficult for us to prove whether the Owners disclosed the Know-how to family members. Therefore, each Owner agrees that he or she will be presumed to have violated the terms of Section 15 if any member of his or her immediate family engages in any Prohibited Activities during the Term or Post-Term Restricted Period or uses or discloses the Know-how. However, the Owner may rebut this presumption by furnishing evidence conclusively showing that the Owner did not disclose the Know-how to the family member.

**15.6.    Employees and Others Associated with You.** You must ensure that all of your employees, officers, directors, partners, members, independent contractors and other persons associated with you or your Business who attend our training program and/or have access to our Know-how, sign and send us a Brand Protection Agreement before attending training or having access to our Know-how. You must use your best efforts to ensure that these individuals comply with the terms of the Brand Protection Agreements and you must immediately notify us of any breach that comes to your attention. You agree to reimburse us for all reasonable expenses that we incur in enforcing a Brand Protection Agreement, including reasonable attorneys' fees and court costs. You must ensure that your employees do not have access to our community intranet or training modules.

**15.7.    Covenants Reasonable.** You and the Owners acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; (ii) our use and enforcement of covenants similar to those described above with respect to other CarePatrol franchisees benefits you and the Owners in that it prevents others from unfairly competing with your Business; and (iii) you and the Owners have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms

14

of this Agreement. **YOU AND THE OWNERS HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS <u>SECTION 15</u> AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.**

  **15.8.** <u>**Breach of Covenants**</u>. You and the Owners agree that failure to comply with the terms of this <u>Section 15</u> will cause substantial and irreparable damage to us and/or other CarePatrol franchisees for which there is no adequate remedy at law. Therefore, you and the Owners agree that any violation of the terms of this <u>Section 15</u> will entitle us to injunctive relief. We may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you or an Owner may have against us, regardless of cause or origin, cannot be used as a defense against our enforcement of this Section 15. For clarity, "claim" means any and all claims, actions, demands, assessments, litigation, or other form of regulatory or adjudicatory procedures, claims, demands, assessments, investigations, or formal or informal inquiries.

## 16. YOUR OTHER RESPONSIBILITIES

  **16.1.** <u>**Insurance.**</u> You must obtain the insurance coverage that we require from time to time (whether in the Franchise Agreement or in the Manual). You must purchase these policies through our designated insurance broker:

  You must obtain the insurance coverage that we require from time to time (whether in the Franchise Agreement or in the Manual). You must purchase these policies through our designated insurance broker:

**If your annual revenue is between $0 and $499,999 you must obtain the following coverages:**

    (a) Commercial general liability insurance, written on an occurrence policy form, including bodily injury, property damage, personal injury, products and completed operations liability coverage with a limit of not less than $1,000,000 ($3,000,000 in aggregate);

    (b) Professional liability insurance, written on an occurrence policy form, with a combined single limit of not less than $1,000,000 ($3,000,000 in aggregate) including sexual molestation and abuse with a minimum sub-limit of $100,000;

    (c) Network security insurance (cyber insurance) with a minimum $250,000 aggregate; maximum $5,000 retention/deductible (retro inception) which is comprised of: Electronic information security event coverage up to $250,000 and privacy crisis management expense, with coverage up to $250,000;

    (d) If applicable, worker's compensation and employer's liability to meet statutory requirements of your state(s) of operation. You shall maintain worker's compensation and employers' liability insurance coverages regardless if mandated by state law; and

    (e) Other insurance as may be required by the state or locality in which the franchised business is located and operated.

**If your annual revenue is between $500,000 and $999,999, you must obtain the coverages indicated in paragraphs (a) – (e) above as well as:**

    (f) Employment practices liability insurance (EPLI) with a minimum aggregate of $250,000

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

including sub-limits of at least: $100,000 for FLSA/wage and hour claims, $100,000 for violation of employee privacy claims and $25,000 for work eligibility (I-9) claims. In addition, the policy should include: independent contractors in the definition of potential employees as well as third-party coverage.

**If your annual revenue is equal to or greater than $1,000,000, you must obtain the coverages indicated in paragraphs (a) – (f) above as well as:**

        (g)      An umbrella or excess liability policy in the amount of not less than $1,000,000.

You must also purchase any other limits and coverage that we periodically require. The required coverage and policies are subject to change. All insurance policies must be endorsed to: (i) name us (and our members, officers, directors, and employees) as additional insureds; (ii) contain a waiver by the insurance carrier of all subrogation rights against us; and (iii) provide that we receive 10 days' prior written notice of the termination, expiration, cancellation or modification of the policy.

       **16.2.**   **Auto Coverage**: We recommend purchasing a commercial auto insurance policy for your vehicle. In the event that you elect to continue your personal auto insurance policies, a "Business Use Endorsement" is required to be added to the policy along with a $1,000,000 personal umbrella policy. Proof of both coverages must be provided to us annually.

       **16.3.**   **Other Insurance Requirements**. You must also purchase any other limits and coverage that we periodically require. The required coverage and policies are subject to change. All insurance policies must be endorsed to: (i) name us (and our members, officers, directors, and employees) as additional insureds; (ii) contain a waiver by the insurance carrier of all subrogation rights against us; and (iii) provide that we receive 10 days' prior written notice of the termination, expiration, cancellation or modification of the policy. You agree to indemnify and hold harmless us, its directors, officers and employees, from and against all loss or expense (including costs and attorney's fees) by reason of liability imposed by law for damages because of personal injury sustained by any person or persons or damage to property, including loss of use thereof, arising out of the performance of this contract, except only damages due to the sole negligence of the us. us may reasonably increase the minimum liability protection requirement annually and require, at any time on reasonable prior notice to you, different or additional kinds of insurance to reflect inflation, changes in standards of liability or higher damage awards in public, product or motor vehicle liability litigation or other relevant changes in circumstances. you shall submit to us annually a copy of the certificate or endorsement of, or other evidence request by us of, the renewal or extension of, each insurance policy. If you at any time fails or refuses to maintain in effect any insurance coverage required by us, or to furnish satisfactory evidence, us, at its option and in addition to its other rights and remedies, may obtain insurance coverage on behalf of you, and you must promptly execute any applications or other forms or instruments required to obtain any insurance and pay to us, on demand, any costs and premiums incurred by us. All insurance policies shall be issued by the insurance carrier or insurance carriers acceptable to us and must list us, CarePatrol Franchise Systems, LLC, as an additional insured, shall contain a waiver of insurance company's right of subrogation against us and shall provide that us will receive thirty (30) days prior written notice of expiration or cancellation of policy or material change of the policy, and shall also contain a provision that us, although named as an insured, will nevertheless be entitled to recover under said policies on any loss occasioned to us or its servants, agents, or employees by reason of the negligence of you or its servants, agents, or employees. You must furnish a certificate of insurance showing the liability limits specified in the Manual directly to our office within 30 days of your purchase and prior to any training in the field. You are required to submit copies annually thereafter. In addition, in order to monitor claims activity on a national level, and to most effectively assess program exposures, each franchisee is required, as requested, to collect Loss History Statements ("Loss Runs") from the carriers and remit to us.

       **16.4.**   **Books and Records.** You agree to prepare and maintain at your business throughout the Term (and all renewal terms) and for a period of six (6) years after the expiration, termination or Transfer of this Agreement, complete and accurate books, records, accounts and tax returns pertaining to your Business, including, without limitation, all Business Records. "Business Records" means any and all evidence of each business

16

transaction, and all financial, marketing, and other operating aspects of the Business, and all evidence and records with respect to customers, clients, employees, and other service professionals relating the Business including, without limitation, all databases in print, electronic or other form, including all names, addresses, phone numbers, email addresses, customer/client records, and all other records contained in the database, and all other records created and maintained by you relating to the operation of your Business. You must maintain, and upon our request furnish to us by e-mail, mail or facsimile, a written list of all of your clients, including seniors and their families seeking placement services, referring facilities (such as hospitals, senior living facilities, nursing homes and other senior care providers) and placement facilities (such as assisted living facilities, independent living facilities, nursing homes or other senior care facilities). You must send us copies of your books and records within seven (7) days of our request.

**16.5.** **Reports.** You must furnish us within 30 days from the end of each month a true and complete copy of the previous month's profit and loss statement. You also agree to prepare all other reports that we require in the form and manner that we require. You agree to send us a copy of any report required by this Section upon request. If we require that you purchase a computer and/or automated cash management system that allows us to electronically retrieve information concerning your sales transactions, you agree that we will have the right to electronically poll your computer and/or automated cash management system to retrieve and compile information regarding the operation of your Business.

**16.6.** **Financial Statements.** Within 90 days after the end of each calendar year, you must prepare a balance sheet for your Business (as of the end of the calendar year) and an annual statement of profit and loss and source and application of funds. All financial statements must be: (i) compiled by an independent certified public accountant; (ii) verified and signed by you certifying to us that the information is true, complete, and accurate; (iii) prepared on an accrual basis in compliance with Generally Accepted Accounting Principles; and (iv) submitted in any format that we reasonably require. You agree to send us a copy of any financial statement required by this Section upon request. You authorize us to disclose the financial statements, reports, and operating data to prospective franchisees, regulatory agencies and others at our discretion, provided the disclosure is not prohibited by applicable law.

**16.7.** **Legal Compliance.** You are solely responsible for researching and maintaining compliance with all applicable laws and regulations, including, but not limited to, all required licenses, permits and regulatory approvals for the operation of your Business. You must notify us in writing within two (2) business days of the beginning of any action, suit, investigation or proceeding, or of the issuance of any order, writ, injunction, disciplinary action, award or decree of any court, agency or other governmental instrumentality, which may adversely affect the operation of your Business or your financial condition. You must immediately deliver to us a copy of any inspection report, warning, certificate or rating by any governmental agency involving any health or safety law, rule or regulation that reflects your failure to fully comply with the law, rule or regulation. If any applicable law prohibits you from charging facilities percentage-based fees or prohibits facilities from paying you for placements, then we will alter our System to comply with the applicable law.

**17.** **INSPECTION AND AUDIT**

**17.1.** **Inspections.** To ensure compliance with this Agreement, we or our representatives will have the right to enter your business, evaluate your operations and inspect or examine your books, records, accounts and tax returns. Our evaluation may include monitoring your operations and interactions with clients and placement facilities. We may also contact your employees, clients and placement facilities. We may conduct our evaluation at any time and without prior notice. During the course of our inspections, we and our representatives will use reasonable efforts to minimize our interference with the operation of your Business, and you and your employees will cooperate and not interfere with our inspection. You consent to us accessing your computer system and retrieving any information that we deem appropriate in conducting the inspection.

REDACTED - Confidential and Proprietary

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

## 18.    INTELLECTUAL PROPERTY

**18.1.    <u>Ownership and Use of Intellectual Property</u>**. You acknowledge that: (i) we are the sole and exclusive owner of the Intellectual Property and the goodwill associated with the Marks; (ii) your right to use the Intellectual Property is derived solely from this Agreement; and (iii) your right to use the Intellectual Property is limited to a license granted by us to operate your Business during the Term pursuant to, and only in compliance with, this Agreement, the Manual, and all applicable standards, specifications and operating procedures that we prescribe from time to time. You may not use any of the Intellectual Property in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized by us. Any unauthorized use of the Intellectual Property constitutes an infringement of our rights. You agree to comply with all provisions of the Manual governing your use of the Intellectual Property. This Agreement does not confer to you any goodwill, title or interest in any of the Intellectual Property.

**18.2.    <u>Changes to Intellectual Property</u>**. We have the right to modify the Intellectual Property at any time in our sole and absolute discretion, including by changing the Marks, the System, the Copyrights or the Know-how.*" Intellectual Property"* means, collectively or individually, our Marks, Copyrights, Know-how, System, Improvements and Business Records. *"Marks"* means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a CarePatrol business, including "CarePatrol," and any other trademarks, service marks or trade names that we designate for use in a CarePatrol business. *"System"* means our unique system for the operation of a CarePatrol business, the distinctive characteristics of which include logo, trade secrets, concept, style, methods of internet of usage, marketing programs, proprietary programs and products, confidential brand standards manual and operating system. *"Know-how"* means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a CarePatrol business, including, but not limited to, methods, techniques, specifications, procedures, policies, marketing strategies and information comprising the System and the Manual. *"Copyrights"* means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow CarePatrol franchisees to use, sell or display in connection with the marketing and/or operation of a CarePatrol business, whether now in existence or created in the future. If we modify or discontinue use of any of the Intellectual Property, then you must comply with any such instructions from us within 30 days at your expense. We will not be liable to you for any expenses, losses or damages that you incur (including the loss of any goodwill associated with a Mark) because of any addition, modification, substitution or discontinuation of the Intellectual Property.

**18.3.    <u>Use of Marks</u>**. You agree to use the Marks as the sole identification of your Business; provided, however that you must identify yourself as the independent owner of your Business in the manner that we prescribe. You may not use any Marks in any modified form or as part of any corporate or trade name or with any prefix, suffix, or other modifying words, terms, designs or symbols (other than logos licensed to you by this Agreement). You agree to: (i) prominently display the Marks on or in connection with any media advertising, promotional materials, posters and displays, receipts, stationery and forms that we designate and in the manner that we prescribe to give notice of trade and service mark registrations and copyrights; and (ii) obtain any fictitious or assumed name registrations required under applicable law. You may not use the Marks in signing any contract, lease, mortgage, check, purchase agreement, negotiable instrument or other legal obligation or in any manner that is likely to confuse or result in liability to us for any indebtedness or obligation of yours.

**18.4.** <u>Use of Know-how</u>. We will disclose the Know-how to you in the initial training program, the Manual, and in other guidance furnished to you during the Term. You agree that you will not acquire any interest in the Know-how other than the right to utilize it in strict accordance with the terms of this Agreement in the development and operation of your Business. You acknowledge that the Know-how is proprietary and is disclosed to you solely for use in the development and operation of your Business during the Term.

**18.5.** <u>New Concepts and Improvements.</u> If (i) you, or your employees or principals, develop any new concept, process, or improvement in the operation or promotion of the Business, you must promptly notify us and provide us with all necessary related information, without compensation; (ii) any new concept, process, or improvement will become our sole property and we will be the sole owner of all patents, patent applications, trademarks, copyrights, and other intellectual property rights related to these new concepts; (iii) you (and your principals) will assign any rights in new concepts to us, assist us in obtaining and enforcing intellectual property rights related to new concepts, and designate us as your agent and attorney-in-fact to file all documentation related to the new concepts; and (iv) if the foregoing language in this provision is found to be invalid or otherwise unenforceable, you will grant to us a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the new concept."

**18.7.** <u>Ownership of Business Records.</u> You acknowledge and agree that we have access to, and will be the exclusive owner of, all of your Business Records. You are licensed to use all Business Records solely in connection with the operation of your Business. All such Business Records are deemed part of our Intellectual Property. We may utilize your Business Records in any manner that we deem appropriate and to be in the best interest of the System.

**18.8.** <u>Notification of Infringements and Claims</u>. You must immediately notify us of any: (i) apparent infringement of any of the Intellectual Property; (ii) challenge to your use of any of the Intellectual Property; or (iii) claim by any person of any rights in any of the Intellectual Property. You may not communicate with any person other than us and our counsel in connection with any such infringement, challenge or claim. We will have sole discretion to take such action as we deem appropriate. We have the right to exclusively control any litigation, Patent and Trademark Office proceeding, or other proceeding arising out of any such infringement, challenge or claim. You agree to execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of our counsel, be necessary or advisable to protect and maintain our interest in any such litigation, Patent and Trademark Office proceeding or other proceeding, or to otherwise protect and maintain our interest in the Intellectual Property.

## 19. INDEMNITY.

You agree to indemnify the indemnified parties (as defined below) and hold them harmless for, from and against any and all losses and expenses incurred by any of them as a result of or in connection with any of the following claims: (i) any claim asserted against you and/or any of the indemnified parties arising from the marketing, use or operation of your business or your performance and/or breach of any of your obligations under this agreement; (ii) any claim relating to taxes or penalties assessed by any governmental entity against us that are directly related to your failure to pay or perform functions required of you under this agreement; (iii) any labor, employment or similar type of claim pertaining to your employees, including claims alleging that we are a joint employer of your employees; and (iv) any actions, investigations, rulings or proceedings conducted by any state or federal agency relating to your employees, including, without limitation, the united states department of labor, the equal employment opportunity commission and the national labor relations board. You and your owners agree to give us notice of any action, suit, proceeding, claim, demand, inquiry or investigation described above. The indemnified parties shall have the right, in their sole discretion to: (i) retain counsel of their own choosing to represent them with respect to any claim; and (ii) control the response thereto and the defense thereof, including the right to enter into an agreement to settle such claim. You may participate in such defense at your own expense. You agree to give your full cooperation to the indemnified parties in assisting the indemnified parties with the defense of any such claim, and to reimburse the indemnified parties for all of their costs and expenses in defending any such claim, including court costs and reasonable attorneys' fees, within 10 days of the date of each invoice delivered

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

by such indemnified party to you enumerating such costs, expenses and attorneys' fees. *"Indemnified party"* or *"indemnified parties"* means us and each of our past, present and future owners, members, officers, directors, employees and agents, as well as our parent companies, subsidiaries and affiliates, and each of their past, present and future owners, members, officers, directors, employees and agents. *"losses and expenses"* means all compensatory, exemplary, and punitive damages; fines and penalties; attorneys' fees; experts' fees; court costs; costs associated with investigating and defending against claims; settlement amounts; judgments; compensation for damages to our reputation and goodwill; and all other costs, damages, liabilities and expenses associated with any of the foregoing losses and expenses or incurred by an indemnified party as a result of a claim. Provided that you are not in default under this Agreement or any other agreement with us, we will indemnify you and your Owners and hold them harmless for, from and against any and all Losses and Expenses incurred by any of them as a result of or in connection with any Claim asserted against you and/or your Owners based upon the violation of any third party's intellectual property rights caused by your use of our Marks in strict compliance with the terms of this Agreement and the Manual. You must promptly notify us of any such Claim and fully cooperate with us in the defense of such Claim**.**

**20.     TRANSFERS**

    **20.1.     By Us**. This Agreement and the franchise is fully assignable by us (without prior notice to you) and shall inure to the benefit of any assignee(s) or other legal successor(s) to our interest in this Agreement, provided that we shall, subsequent to any such assignment, remain liable for the performance of our obligations under this Agreement up to the effective date of the assignment. We may also delegate some or all of our obligations under this Agreement to one or more persons without assigning the Agreement.

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

**20.3.** **Permitted Transfers.** You may engage in a Permitted Transfer without our prior approval, but you must give us at least 10 days prior written notice. *"Permitted Transfer"* means: (i) a Transfer from one Owner to another Owner who was an approved Owner prior to such Transfer, other than a Transfer by an Owner who is the Managing Owner that results in the Managing Owner no longer holding any ownership interest in the franchise; and/or (ii) a Transfer to a newly established Entity for which the Owners collectively own and control 100% of the ownership interests and voting power.

You and the Owners (and the transferee) agree to sign all documents that we reasonably request to effectuate and document the Permitted Transfer.

**20.4.** **Death or Disability of an Owner.** Upon the death or permanent disability of an Owner, the Owner's ownership interest in you or the franchise, as applicable, must be assigned to another Owner or to a third party approved by us within 120 days. Any assignment to a third party will be subject to all of the terms and conditions of Section 20.2 unless the assignment qualifies as a Permitted Transfer. For purposes of this Section, an Owner is deemed to have a "permanent disability" only if the person has a medical or mental problem that prevents the person from substantially complying with his or her obligations under this Agreement or otherwise operating the Business in the manner required by this Agreement and the Manual for a continuous period of at least three (3) months.

**20.5.** **Our Right of First Refusal.** If you or an Owner desires to engage in a Transfer, you or the Owner, as applicable, must obtain a bona fide, signed written offer from the fully disclosed purchaser and submit an exact copy of the offer to us. We will have 30 days after receipt of the offer to decide whether we will purchase the interest in your Business or the ownership interest in you for the same price and upon the same terms contained in the offer (however, we may substitute cash for any form of payment proposed in the offer). If we notify you that we intend to purchase the interest within the 30-day period, you or the Owner, as applicable, must sell the interest to us. We will have at least an additional 30 days to prepare for closing. We will be entitled to receive from you or the Owner, as applicable, all customary representations and warranties given by you as the seller of

the assets or the Owner as the seller of the ownership interest or, at our election, the representations and warranties contained in the offer. If we do not exercise our right of first refusal, you or the Owner, as applicable, may complete the Transfer to the purchaser pursuant to and on the terms of the offer, subject to the requirements of Section 20.2 (including our approval of the transferee). However, if the sale to the purchaser is not completed within 120 days after delivery of the offer to us, or there is a material change in the terms of the sale, we will again have the right of first refusal specified in this Section. Our right of first refusal in this Section shall not apply to any Permitted Transfer.

## 21. TERMINATION

21.1. **Termination By Us Without Cure Period**. We may, in our sole discretion, terminate this Agreement upon five (5) days' written notice, without opportunity to cure, for any of the following reasons, all of which constitute material events of default under this Agreement:

(a) if the Managing Owner fails to satisfactorily complete the initial training program in the manner required by Section 4.1;

(b) if you fail to open your Business within the time period required by Section 6.2;

(c) if you become insolvent by reason of your inability to pay your debts as they become due or you file a voluntary petition in bankruptcy or any pleading seeking any reorganization, liquidation, dissolution or composition or other settlement with creditors under any law, or are the subject of an involuntary bankruptcy (which may or may not be enforceable under the Bankruptcy Act of 1978);

(d) if your Business, or a substantial portion of the assets associated with your Business, are seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lienholder or lessor; or a final judgment against you remains unsatisfied for 30 days (unless a supersedes or other appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in your Business, and it is not discharged within five (5) days of the levy;

(e) if you abandon or fail to operate your Business for three (3) consecutive business days, unless the failure is due to an event of force majeure or another reason that we approve;

(f) if a regulatory authority suspends or revokes a license or permit held by you or an Owner that is required to operate the Business, even if you or the Owner still maintain appeal rights;

(g) if you or an Owner (a) is convicted of or pleads no contest to a felony, a crime involving moral turpitude or any other material crime or (b) is subject to any material administrative disciplinary action or (c) fails to comply with any material federal, state or local law or regulation applicable to your Business;

(h) if you or an Owner commits an act that can reasonably be expected to adversely affect the reputation of the System or the goodwill associated with the Marks;

(i) if you or an Owner make any material misrepresentation to us, whether occurring before or after being granted the franchise;

(j) if you fail to pay any amount owed to us or an affiliate of ours within ten (10) days after receipt of a demand for payment;

(k) if you under-report any amount owed to us by at least two percent (2%), after having already committed a similar breach that had been cured in accordance with this section;

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

(l)     if you or an Owner makes an unauthorized Transfer;

(m)     if you or an Owner makes an unauthorized use of the Intellectual Property;

(n)     if you or an Owner breaches any of the Brand Protection covenants described in Section 15;

(o)     if any Owner, or the spouse of any Owner, breaches a Franchise Owner Agreement;

(p)     if you engage in unauthorized placement services outside of your Territory without obtaining the requisite permission to do so;

(q)     if you fail to meet the minimum performance requirements described in Section 12; or

(r)     if we terminate any other agreement between you and us or if any affiliate of ours terminates any agreement between you and the affiliate because of your default.

**21.2.**   **Additional Conditions of Termination**. In addition to our termination rights in Section 21.1, we:

(a)     May, in our sole discretion, terminate this Agreement upon 30 days' written notice if you or an Owner fail to comply with any other provision of this Agreement (including any mandatory provision in the Manual) or any other agreement with us, unless such default is cured, as determined by us in our sole discretion, within such 30-day notice period. If we deliver a notice of default to you pursuant to this Section 21.2, we may suspend performance of any of our obligations under this Agreement until you fully cure the breach.

(b)     Reserve the right to collect from you our lost future royalties beginning from the date of termination through what would have been the remaining Term of the Agreement.

**21.3.**   **Mutual Agreement to Terminate.** If you and we mutually agree in writing to terminate this Agreement, you and we will be deemed to have waived any required notice period.

## 22.   POST-TERM OBLIGATIONS.

After the termination, expiration or Transfer of this Agreement, you and the Owners agree to:

(a)     immediately cease to use the Intellectual Property;

(b)     pay us all amounts that you owe us;

(c)     comply with all covenants described in Section 15 that apply after the expiration, termination or Transfer of this Agreement or the disposal of an ownership interest by an Owner;

(d)     return all copies of the Manual, or any portions thereof, as well as all signs, sign faces, brochures, advertising and promotional materials, forms, and any other materials bearing or containing any of the Marks, Copyrights or other identification relating to a CarePatrol business, unless we allow you to transfer such items to an approved transferee;

(e)     cease utilizing our proprietary client database software and delete all copies from your computer;

(f)     send us copies of all of your Business Records;

23

(g)     upon our request, assist us with notifying and transitioning all of your clients, referring facilities (such as hospitals, senior living facilities, nursing homes and other senior care providers) and placement facilities (such as assisted living facilities, independent living facilities, nursing homes or other senior care facilities) to us or to another franchisee that we designate for further service;

(h)     upon our request, assign to us or to another franchisee that we designate all of your agreements with referring facilities and placement facilities relating to your CarePatrol Business;

(i)     take such action as may be required to cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Marks;

(j)     provide us with access to your computer system for purposes of conducting a final inspection and audit (if we choose to conduct an audit) and fully cooperate with us in connection with any such inspection and audit;

(k)     notify all telephone companies, listing agencies and domain name registration companies (collectively, the "Agencies") of the termination or expiration of your right to use: (a) the telephone numbers and/or domain names, if applicable, related to the operation of your Business; and (b) any regular, classified or other telephone directory listings associated with the Marks (you hereby authorize the Agencies to transfer such telephone numbers, domain names and listings to us and you authorize us, and appoint us and any officer we designate as your attorney-in-fact to direct the Agencies to transfer the telephone numbers, domain names and listings to us if you fail or refuse to do so); and

(l)     provide us with satisfactory evidence of your compliance with the above obligations within 30 days after the effective date of the termination, expiration or Transfer of this Agreement.

## 23. DISPUTE RESOLUTION.

**23.1**    **Mediation.** Except as otherwise stated in this Section 23.1, the parties agree to submit any claim, controversy or dispute arising out of or relating to this agreement (and attachments) or the relationship created by this agreement to non-binding mediation before bringing such claim, controversy or dispute to a court. The mediation will be conducted either through an individual mediator or a mediator appointed by a mediation services organization, experienced in the mediation of disputes between franchisors and franchisees, agreed upon by the parties. If the parties do not agree upon a mediator or mediation services organization with fifteen (15) days after either party has notified the other of its desire to seek mediation, the dispute will be mediated by the American Arbitration Association pursuant to its rules governing mediation, in the city in which CarePatrol's corporate headquarters are located at the time of the mediation. Each party will bear their own costs of mediation and the parties will share equally any filing fee imposed by the mediation services organization and the mediator's compensation. If the parties cannot resolve the claim, controversy or dispute within forty-five (45) days after conferring with the mediator, either party may submit such claim, controversy or dispute to arbitration under Section 23.2 below. Either party may bring an action under the applicable provisions of this section 18 without first submitting the action to mediation under this Section 23.1; (i) for monies owed, (ii) for injunctive relief, (iii) claims involving the possession or disposition of, or other relief relating to, real property or (iv) claims or disputes regarding territorial infraction determination under this Agreement.

**23.2.**    **Arbitration**. Except to the extent CarePatrol elects to enforce the provisions of this Agreement by injunction as provided in Section 23.3 below, all disputes, claims and controversies between the parties, whether arising under or in connection with this Agreement or the negotiation, making, performance, breach or interpretation thereof (including claims of fraud in the inducement and other claims of fraud in the arbitrability of any matter) that have not been settled by or are not otherwise subject to mediation as described in Section 23.1 above will be resolved by arbitration under the authority of the Federal Arbitration Act in the city in which our headquarters are located at the time of the arbitration. The proceedings will be conducted under the Commercial Arbitration Rules of the American Arbitration Association, or the rule of such other arbitration services

24

organization as the parties otherwise may agree upon in writing, to the extent such rules are not inconsistent with the provisions of this arbitration provision. The arbitrator will have a minimum of five (5) years' experience in franchising or distribution law and will have the right to award specific performance of this Agreement. The arbitration will be on an individual basis only and not consolidated with any other proceeding. As part of the arbitration proceedings, each party agrees to submit no more than twenty-five (25) interrogatories or to conduct no more than four (4) depositions during the course of discovery. The decision of the arbitrator will be final and binding on all parties; provided, however, the arbitrator may not under any circumstances: (i) stay the effectiveness of any pending termination of this Agreement; (ii) assess punitive or exemplary damages; or (iii) make any award which extends, modifies or suspends any lawful term of this Agreement or any reasonable standard of business performance set by us. The binding or preclusive effect of any award will be limited to the actual dispute or claim arbitrated, and to the parties, and will have no collateral effect on any other dispute or claim of any kind. This Section 18 will survive termination or nonrenewal of this Agreement under any circumstances. Judgment upon the award of the arbitrator may be entered in any court having jurisdiction thereof. During any arbitration proceeding, Franchisor and Franchisee will fully perform our respective obligations under this Agreement.

**23.3.** **Injunctive Relief**. Notwithstanding Sections 23.1 and 23.2 above, you recognize that a single franchisee's failure to comply with the terms of this Agreement could cause irreparable damage to us and/or to some or all other CarePatrol franchisees. Therefore, if Franchisee breaches or threatens to breach any of the terms of this Agreement, CarePatrol will be entitled to an injunction restraining such breach and/or a decree of specific performance, without showing or proving any actual damage, together with recovery of reasonable attorneys' fees and other costs incurred in obtaining such equitable relief, until such time as a final and binding determination is made by the arbitrators. Any claims, controversies or disputes arising out of or related to this Agreement that are not subject to arbitration as provided above will be brought in the federal or state court located closest to our headquarters. Franchisor and Franchisee irrevocably consent to the jurisdiction of such courts. The parties agree to submit any claim, dispute or disagreement, including any matter pertaining to the interpretation of this Agreement or issues relating to the offer and sale of the franchise or the relationship between the parties (a "Dispute") to mediation before a mutually-agreeable mediator prior to arbitration. If the Dispute is not resolved by mediation within 30 days after either party makes a demand for mediation, the parties will submit the dispute to mandatory and binding arbitration conducted pursuant to the Commercial Arbitration Rules of the American Arbitration Association. The party filing the arbitration must initially bear the cost of any arbitration fees or costs. The arbitrators will not have authority to award exemplary or punitive damages. Notwithstanding the foregoing, any Dispute that involves an alleged breach of Section 14 or Section 15 will not be subject to mediation or arbitration unless otherwise agreed to by both parties, and either party may immediately file a lawsuit in accordance with this Section with respect to any alleged breach of Section 14 or Section 15. All mediation, arbitration and litigation shall take place in the county in which we maintain our principal place of business at the time the Dispute arises (currently, Maricopa County, Arizona) and the parties irrevocably waive any objection to such venue. If we or you must enforce this Agreement in a judicial or arbitration proceeding, the substantially prevailing party will be entitled to reimbursement of its costs and expenses, including reasonable accounting and legal fees. In addition, if you breach any term of this Agreement or any other agreement with us or an affiliate of ours, you agree reimburse us for all reasonable legal fees and other expenses we incur relating to such breach, regardless of whether the breach is cured prior to the commencement of any dispute resolution proceedings.

**24.** **YOUR REPRESENTATIONS**. YOU HEREBY REPRESENT THAT: (i) YOU HAVE NOT RECEIVED OR RELIED UPON ANY WARRANTY OR GUARANTEE, EXPRESS OR IMPLIED, AS TO THE POTENTIAL VOLUME, PROFITS OR SUCCESS OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT, EXCEPT FOR ANY INFORMATION DISCLOSED IN THE FRANCHISE DISCLOSURE DOCUMENT; (ii) YOU HAVE NO KNOWLEDGE OF ANY REPRESENTATIONS BY US OR ANY OF OUR OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES OR REPRESENTATIVES ABOUT THE BUSINESS CONTEMPLATED BY THIS AGREEMENT THAT ARE CONTRARY TO THE TERMS OF THIS AGREEMENT OR THE FRANCHISE DISCLOSURE DOCUMENT; (iii) YOU RECEIVED (1) AN EXACT COPY OF THIS AGREEMENT AND ITS ATTACHMENTS AT LEAST SEVEN (7) CALENDAR DAYS PRIOR TO THE DATE ON WHICH THIS AGREEMENT IS EXECUTED; AND (2) OUR FRANCHISE

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

DISCLOSURE DOCUMENT AT THE EARLIER OF (A) FOURTEEN (14) CALENDAR DAYS BEFORE YOUR EXECUTION OF ANY BINDING AGREEMENT WITH US OR PAYMENT OF ANY CONSIDERATION THAT RELATES TO THE FRANCHISE RELATIONSHIP OR (B) YOUR REASONABLE REQUEST TO RECEIVE A COPY OF THE FDD; (iv) YOU ARE AWARE OF THE FACT THAT OTHER PRESENT OR FUTURE FRANCHISEES OF OURS MAY OPERATE UNDER DIFFERENT FORMS OF AGREEMENT AND CONSEQUENTLY THAT OUR OBLIGATIONS AND RIGHTS WITH RESPECT TO OUR VARIOUS FRANCHISEES MAY DIFFER MATERIALLY IN CERTAIN CIRCUMSTANCES; (v) YOU ARE AWARE OF THE FACT THAT WE MAY HAVE NEGOTIATED TERMS OR OFFERED CONCESSIONS TO OTHER FRANCHISEES AND WE HAVE NO OBLIGATION TO OFFER YOU THE SAME OR SIMILAR NEGOTIATED TERMS OR CONCESSIONS; AND (vi) YOU HAVE CONDUCTED AN INDEPENDENT INVESTIGATION OF THE BUSINESS CONTEMPLATED BY THIS AGREEMENT AND RECOGNIZE THAT IT INVOLVES BUSINESS RISKS, MAKING THE SUCCESS OF THE VENTURE LARGELY DEPENDENT UPON YOUR OWN BUSINESS ABILITIES, EFFORTS AND JUDGMENTS, AND THE SERVICES OF YOU AND THOSE YOU EMPLOY.

## 25.    GENERAL PROVISIONS

**25.1.    Governing Law.** Except as governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051, et seq.), this Agreement and the franchise relationship shall be governed by the laws of the State of Arizona (without reference to its principles of conflicts of law), but any law of the State of Arizona that regulates the offer and sale of franchises or business opportunities or governs the relationship of a franchisor and its franchisee will not apply unless its jurisdictional requirements are met independently without reference to this Section.

**25.2.    Jury Trial Waiver.** Each party to this Agreement irrevocably each waive trial by jury in any action brought by either of them.  Each party agrees that any litigation, suit, action, counterclaim, cross claim or proceeding, whether at law or in equity, which arises out of, concerns, or is related to this Agreement or any of the relationships or transaction contemplated hereunder, the performance of this Agreement, the relationship between the parties or otherwise shall be tried before a court of competent jurisdiction and not a jury.

**25.3.    Class Action Waiver.** Any action between the parties shall be conducted on an individual basis, and not as part of a consolidated, common, representative, joint, group, or class action.

**25.4.    Relationship of the Parties.** You understand and agree that nothing in this Agreement creates a fiduciary relationship between you and us or is intended to make either party a general or special agent, legal representative, subsidiary, joint venture, partner, employee or servant of the other for any purpose. During the Term, you must conspicuously identify yourself at your base of operations, and in all dealings with third parties, as a franchisee of ours and the independent of your Business. You agree to place such other notices of independent ownership on such forms, stationery, advertising, business cards and other materials as we may require from time to time. Neither we nor you are permitted to make any express or implied agreement, warranty or representation, or incur any debt, in the name of or on behalf of the other or represent that our relationship is other than franchisor and franchisee. In addition, neither we nor you will be obligated by or have any liability under any agreements or representations made by the other that are not expressly authorized by this Agreement.

**25.5.    Severability and Substitution**. Each section, subsection, term and provision of this Agreement, and any portion thereof, shall be considered severable. If any applicable and binding law imposes mandatory, non-waivable terms or conditions that conflict with a provision of this Agreement, the terms or conditions required by such law shall govern to the extent of the inconsistency and supersede the conflicting provision of this Agreement. If a court concludes that any promise or covenant in this Agreement is unreasonable and unenforceable: (i) the court may modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable; or (ii) we may unilaterally modify such promise or covenant to the minimum extent necessary to make such promise or covenant enforceable.

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

**25.6. <u>Abbreviated Statute of Limitations</u>.** Notwithstanding anything contained in this Agreement to the contrary, the parties agree that any claims by you under, arising out of, or related, this Agreement must be brought by you within one (1) year of the date on which the underlying cause of action accrued, and you hereby waive any right to bring any such action after such one-year period.

**25.7. <u>Approvals</u>.** Whenever this Agreement requires our approval, you must make a timely written request for approval, and the approval must be in writing in order to bind us. Except as otherwise expressly provided in this Agreement, if we fail to approve any request for approval within the required period of time, we shall be deemed to have disapproved your request. If we deny approval and you seek legal redress for the denial, the only relief to which you may be entitled is to acquire our approval. You are not entitled to any other relief or damages for our denial of approval.

**25.8. <u>Waiver of Damages</u>.** No delay, waiver, omission or forbearance on the part of us to exercise any right, option, duty or power arising out of any breach or default by you under this Agreement constitutes a waiver by us to enforce any right, option, duty or power against you or as to any subsequent breach or default by you. Acceptance by CarePatrol of any payments due to it subsequent to the time at which the payment is due, is not deemed to be a waiver by us of any preceding breach by you of any terms, provisions, covenants or conditions of this Agreement. We specifically are not deemed to have waived or impaired any right, power or option reserved by this Agreement (including the right to demand exact compliance with every term, condition and covenant, or to declare any breach to be a default and to terminate the franchise before the expiration of its term) by virtue of any custom or practice of the parties at variance with the terms of this Agreement or by any failure, refusal or neglect of us to exercise any right under this Agreement or to insist upon exact compliance by you with its obligations, including any mandatory specification, standard or operating procedure. Neither party is liable for loss or damage or deemed to be in breach of this Agreement if its failure to perform its obligations results from: (1) transportation shortages, inadequate supply of material or energy, or the voluntary foregoing of the right to acquire or use any of the foregoing in order to accommodate or comply with the orders, requests, regulations, recommendations or instructions of any federal, state or municipal government or any department or agency; (2) compliance with any law, ruling, order, regulation, requirement or instruction of any federal, state, or municipal government or any department or agency; (3) acts of God; (4) fires, strikes, embargoes, war or riot; or (5) any other similar event or cause. Any delay resulting from any of the foregoing causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable.

**25.10. <u>Waiver of Obligations</u>.** You hereby waive, to the fullest extent permitted by law, any right to or claim for any punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) against CarePatrol, its affiliates, and the officers, directors, shareholders, partners, agents, representatives, independent contractors, servants and employees of each of them, in their corporate and individual capacities, arising out of any cause whatsoever (whether that cause is based on contract, negligence, strict liability, other tort or otherwise) and agrees that in the event of a dispute, you are limited to the recovery of any actual damages sustained by it. If any other term of this Agreement is found or determined to be unconscionable or unenforceable for any reason, the foregoing provisions of waiver by agreement of punitive, exemplary, incidental, indirect, special, consequential or other damages (including, without limitation, loss of profits) continues in full force and effect.

**25.11. <u>Binding Effect</u>.** This Agreement is binding upon the parties to this Agreement and their respective executors, administrators, heirs, assigns and successors in interest. Nothing in this Agreement is intended, nor shall be deemed, to confer any rights or remedies upon any person or legal entity not a party to this Agreement; provided, however, that the additional insureds listed in Section 16.1 and the Indemnified Parties are intended third party beneficiaries under this Agreement.

**25.12. <u>Integration</u>.** THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND MAY NOT, EXCEPT AS PERMITTED BY SECTION 11.2 AND SECTION 25.7, BE CHANGED EXCEPT BY A WRITTEN DOCUMENT SIGNED BY BOTH PARTIES. Any e-mail correspondence or other form of informal electronic communication shall not be deemed to modify this Agreement

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

unless such communication is signed by both parties and specifically states that it is intended to modify this Agreement. The attachment(s) are part of this Agreement, which, together with any Amendments or Addenda executed on or after the Effective Date, constitutes the entire understanding and agreement of the parties, and there are no other oral or written understandings or agreements between us and you about the subject matter of this Agreement. As referenced above, all mandatory provisions of the Manual are part of this Agreement. Any representations not specifically contained in this Agreement made before entering into this Agreement do not survive after the signing of this Agreement. This provision is intended to define the nature and extent of the parties' mutual contractual intent, there being no mutual intent to enter into contract relations, whether by agreement or by implication, other than as set forth above. The parties acknowledge that these limitations are intended to achieve the highest possible degree of certainty in the definition of the contract being formed, in recognition of the fact that uncertainty creates economic risks for both parties which, if not addressed as provided in this Agreement, would affect the economic terms of this bargain. Nothing in this Agreement is intended to disclaim any of the representations we made in the Franchise Disclosure Document. To the extent that any provision in the Maryland Addendum attached to this Agreement is inconsistent with any provision in this Agreement, the provision in the Maryland Addendum shall control.

      **25.13.**  <u>**Rights of Parties are Cumulative**</u>. The rights of the parties under this Agreement are cumulative and no exercise or enforcement by either party of any right or remedy under this Agreement will preclude any other right or remedy available under this Agreement or by law.

      **25.14.**  <u>**Survival**</u>. All provisions that expressly or by their nature survive the termination, expiration or Transfer of this Agreement (or the Transfer of an ownership interest in the franchise) shall continue in full force and effect subsequent to and notwithstanding its termination, expiration or Transfer and until they are satisfied in full or by their nature expire, including, without limitation, Section 14, Section 15, Section 17, Section 18, Section 19, Section 21, Section 22, Section 23 and Section 25.

      **25.15.**  <u>**Construction.**</u> The headings in this Agreement are for convenience only and do not define, limit or construe the contents of the sections or subsections. All references to Sections refer to the Sections contained in this Agreement unless otherwise specified. All references to days in this Agreement refer to calendar days unless otherwise specified. The term "you" as used in this Agreement is applicable to one or more persons or an Entity, and the singular usage includes the plural and the masculine and neuter usages include the other and the feminine and the possessive.

      **25.16.**  <u>**Time of Essence.**</u> Time is of the essence in this Agreement and every term thereof.

      **25.17.**  <u>**Counterparts.**</u> This Agreement may be signed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

      **25.18.**  <u>**HIPAA Compliance.**</u>  The parties to this Agreement will comply with applicable federal and state rules and regulations, including but not limited to those promulgated from the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and Title XIII of the American Recovery and Reinvestment Act of 2009 (also cited as the "HITECH Act"). The parties shall execute the Business Associate Agreement attached hereto as ATTACHMENT "E."

      **25.19.**  <u>**Notice.**</u> All notices given under this Agreement must be in writing, delivered by hand, email (to the last email address provided by the recipient), first-class mail, or third-party overnight delivery company (e.g., UPS) to the following addresses (which may be changed upon 10 business days prior written notice):

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Agreement

YOU:                     As set forth below your signature on this Agreement

US:                        CarePatrol Franchise Systems, LLC
1760 East Pecos Road, Suite 338
Gilbert, Arizona 85295

WITH A COPY TO:      Stephen D. Greenwald
ComForCare Health Care Holdings, LLC
2520 S. Telegraph Road, Suite 201
Bloomfield Hills, MI 48302

Notice shall be considered given at the time delivered by hand, or one (1) business day after sending by fax, email or comparable electronic system, or three (3) business days after placed in the mail, postage prepaid, by certified mail with a return receipt requested.

The parties to this Agreement have executed this Agreement effective as of the Effective Date first above written.

**FRANCHISOR:**

CarePatrol Franchise Systems, LLC, a
Delaware limited liability company

By: _Stephen Greenwald_____
Name: Stephen D. Greenwald Esq.
Its: In-House Counsel

**YOU (If you are an entity):**           **YOU (If you are not an entity):**

Sustained Care Services, LLC_____,    _____
a(n) Pennsylvania limited liability company    Name: _____

By: _____ / _____    _____
Name: Hercules Bothma  /  Michaela Kulbartz    Name: _____
Its: ___President  /  VP, Secretary and Treasurer

                                                 _____
Name: _____

Franchisee's Principal Business Address:
 7 Forrest Ln_____
 Springfield, PA_____
 19064_____
_____

# ATTACHMENT "A"

## TO FRANCHISE AGREEMENT

## <u>TERRITORY</u>

1) <u>Exclusive Area.</u> The parties to this Agreement agree that the Business to be operated by Franchisee, pursuant to the Franchise Agreement, shall be located in the following United States Postal Service ("USPS") zip codes area:

<u>      see attached map and zipcode list      </u>

2) <u>Changes by the USPS.</u> Zip codes are a system of postal codes used by the United States Postal Services (USPS) and are changed by it from time to time. Changes by the USPS will affect the Zip codes and area that make up your Exclusive Area. For example, if the USPS moves certain addresses in your Exclusive Area into a Zip code in another franchisee's area or into an unassigned area, those addresses will no longer be part of your Exclusive Area.

3) <u>Defined Terms.</u> All capitalized or initial capitalized terms contained in this Addendum and not defined in this Addendum have the same meaning as ascribed to them in the Franchise Agreement.

4) <u>Doing Business Name.</u> In accordance with CarePatrol's standardization requirement, franchisee shall establish the "Doing Business As" (DBA) name of CarePatrol -<u>              </u>.

FRANCHISOR:
CarePatrol Franchise Systems, LLC
a Delaware limited liability company
By: <u>   Stephen Greenwald   </u>
Title: <u>In-House Counsel      </u>

<u>    Stephen D. Greenwald Esq.    </u>

FRANCHISEE:
<u>Sustained Care Services, LLC</u>
<u>a Pennsylvania limited liability company</u>
By: <u>              </u>
Title: <u>President  /  VP, Secretary and Treasurer</u>

<u>   Hercules Bothma  /  Michaela Kulbartz   </u>

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

| CP-PA-Springfield | | | | |
|---|---|---|---|---|
| | Population | Facitlities | | |
| | 1,034,784 | 69 | | |
| Territory | ZIP Code | City | County | State |
| CP-PA-Springfield | 19003 | ARDMORE | DELAWARE | PA |
| CP-PA-Springfield | 19004 | BALA CYNWYD | MONTGOMERY | PA |
| CP-PA-Springfield | 19008 | BROOMALL | DELAWARE | PA |
| CP-PA-Springfield | 19010 | BRYN MAWR | DELAWARE | PA |
| CP-PA-Springfield | 19013 | CHESTER | DELAWARE | PA |
| CP-PA-Springfield | 19014 | ASTON | DELAWARE | PA |
| CP-PA-Springfield | 19015 | BROOKHAVEN | DELAWARE | PA |
| CP-PA-Springfield | 19018 | CLIFTON HEIGHTS | DELAWARE | PA |
| CP-PA-Springfield | 19022 | CRUM LYNNE | DELAWARE | PA |
| CP-PA-Springfield | 19023 | DARBY | DELAWARE | PA |
| CP-PA-Springfield | 19026 | DREXEL HILL | DELAWARE | PA |
| CP-PA-Springfield | 19029 | ESSINGTON | DELAWARE | PA |
| CP-PA-Springfield | 19032 | FOLCROFT | DELAWARE | PA |
| CP-PA-Springfield | 19033 | FOLSOM | DELAWARE | PA |
| CP-PA-Springfield | 19035 | GLADWYNE | MONTGOMERY | PA |
| CP-PA-Springfield | 19036 | GLENOLDEN | DELAWARE | PA |
| CP-PA-Springfield | 19041 | HAVERFORD | DELAWARE | PA |
| CP-PA-Springfield | 19043 | HOLMES | DELAWARE | PA |
| CP-PA-Springfield | 19050 | LANSDOWNE | DELAWARE | PA |
| CP-PA-Springfield | 19052 | LENNI | DELAWARE | PA |
| CP-PA-Springfield | 19060 | GARNET VALLEY | DELAWARE | PA |
| CP-PA-Springfield | 19061 | MARCUS HOOK | DELAWARE | PA |
| CP-PA-Springfield | 19063 | MEDIA | DELAWARE | PA |
| CP-PA-Springfield | 19064 | SPRINGFIELD | DELAWARE | PA |
| CP-PA-Springfield | 19066 | MERION STATION | MONTGOMERY | PA |
| CP-PA-Springfield | 19070 | MORTON | DELAWARE | PA |
| CP-PA-Springfield | 19072 | NARBERTH | MONTGOMERY | PA |
| CP-PA-Springfield | 19073 | NEWTOWN SQUARE | DELAWARE | PA |
| CP-PA-Springfield | 19074 | NORWOOD | DELAWARE | PA |
| CP-PA-Springfield | 19076 | PROSPECT PARK | DELAWARE | PA |
| CP-PA-Springfield | 19078 | RIDLEY PARK | DELAWARE | PA |
| CP-PA-Springfield | 19079 | SHARON HILL | DELAWARE | PA |
| CP-PA-Springfield | 19080 | WAYNE | DELAWARE | PA |
| CP-PA-Springfield | 19081 | SWARTHMORE | DELAWARE | PA |
| CP-PA-Springfield | 19082 | UPPER DARBY | DELAWARE | PA |
| CP-PA-Springfield | 19083 | HAVERTOWN | DELAWARE | PA |
| CP-PA-Springfield | 19085 | VILLANOVA | DELAWARE | PA |
| CP-PA-Springfield | 19086 | WALLINGFORD | DELAWARE | PA |
| CP-PA-Springfield | 19087 | WAYNE | CHESTER | PA |
| CP-PA-Springfield | 19088 | WAYNE | DELAWARE | PA |
| CP-PA-Springfield | 19089 | WAYNE | DELAWARE | PA |
| CP-PA-Springfield | 19091 | MEDIA | DELAWARE | PA |





DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

## CP-PA-Springfield

| | Population | Facitlities | | |
|---|---|---|---|---|
| | 1,034,784 | 69 | | |
| Territory | ZIP Code | City | County | State |
| CP-PA-Springfield | 19092 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19093 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19094 | WOODLYN | DELAWARE | PA |
| CP-PA-Springfield | 19096 | WYNNEWOOD | MONTGOMERY | PA |
| CP-PA-Springfield | 19098 | HOLMES | DELAWARE | PA |
| CP-PA-Springfield | 19113 | PHILADELPHIA | DELAWARE | PA |
| CP-PA-Springfield | 19131 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19139 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19142 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19143 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19151 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19153 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19161 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19170 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19171 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19175 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19176 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19178 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19183 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19188 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19190 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19191 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19195 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19196 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19197 | PHILADELPHIA | PHILADELPHIA | PA |
| CP-PA-Springfield | 19301 | PAOLI | CHESTER | PA |
| CP-PA-Springfield | 19312 | BERWYN | CHESTER | PA |
| CP-PA-Springfield | 19319 | CHEYNEY | DELAWARE | PA |
| CP-PA-Springfield | 19333 | DEVON | CHESTER | PA |
| CP-PA-Springfield | 19339 | CONCORDVILLE | DELAWARE | PA |
| CP-PA-Springfield | 19340 | CONCORDVILLE | DELAWARE | PA |
| CP-PA-Springfield | 19342 | GLEN MILLS | DELAWARE | PA |
| CP-PA-Springfield | 19355 | MALVERN | CHESTER | PA |
| CP-PA-Springfield | 19373 | THORNTON | DELAWARE | PA |
| CP-PA-Springfield | 19380 | WEST CHESTER | CHESTER | PA |
| CP-PA-Springfield | 19382 | WEST CHESTER | CHESTER | PA |
| CP-PA-Springfield | 19383 | WEST CHESTER | CHESTER | PA |
| CP-PA-Springfield | 19415 | EAGLEVILLE | CHESTER | PA |


DocuSigned by:
D4766C1B2D384A2...


DocuSigned by:
FFC6E7516A0743E...


DocuSigned by:
Stephen Greenwald
E917D0B0C0A4429...

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F



DocuSigned by:

D4765C1B2D384A2...

DocuSigned by:

FFC6E7516A0743E...

DocuSigned by:

Stephen Greenwald

E017D0B8C3A4429...

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# ATTACHMENT "B"

## TO FRANCHISE AGREEMENT

### F<small>RANCHISE</small> O<small>WNER</small> A<small>GREEMENT</small>

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# FRANCHISE OWNER AGREEMENT

This Franchise Owner Agreement (this "Agreement") is entered into by: (i) each of the undersigned owners of Franchisee (defined below); and (ii) the spouse of each such owner, in favor of CarePatrol Franchise Systems, LLC, a Delaware limited liability company, and its successors and assigns ("us"), upon the terms and conditions set forth in this Agreement. Each signatory to this Agreement is referred to as "you".

**1. Definitions.** For purposes of this Agreement, the following terms have the meanings given to them below:

"*Competitive Business*" means any business that provides senior referral and placement services similar to or competitive with the services offered by CarePatrol businesses.

"*Copyrights*" means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow CarePatrol franchisees to use, sell or display in connection with the marketing and/or operation of a CarePatrol business, whether now in existence or created in the future.

"*Franchise Agreement*" means the CarePatrol Franchise Agreement executed by Franchisee with an effective date of ____4/22/2019_____.

"*Franchised Business*" means the CarePatrol business operated by Franchisee pursuant to the Franchise Agreement.

"*Franchisee*" means __Sustained Care Services, LLC__.

"*Improvements*" means any additions, modifications or improvements to (i) the goods or services offered at a CarePatrol business, (ii) the method of operation of a CarePatrol business or (iii) any marketing or promotional ideas relating to a CarePatrol business, whether developed by you, Franchisee or any other person.

"*Intellectual Property*" means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

"*Know-how*" means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a CarePatrol business, including, but not limited to, methods, techniques, specifications, procedures, policies, marketing strategies and information comprising the System and the Manual.

"*Manual*" means our confidential brand standards manual for the operation of a CarePatrol business.

"*Marks*" means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a CarePatrol business, including "CarePatrol," and any other trademarks, service marks or trade names that we designate for use in a CarePatrol business.

"*Prohibited Activities*" means any or all of the following: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing (a) any of our employees or managers (or those of our affiliates or franchisees) to leave their position or (b) any Customer of ours (or of one of our affiliates or franchisees) to transfer their business to Owner or to any other person that is not then a franchisee of ours.

"*Restricted Period*" means the one (1) year period after the earliest to occur of the following: (i) the termination or expiration of the Franchise Agreement; (ii) the date on which Franchisee assigns the Franchise Agreement to another person with respect to whom neither you nor your spouse holds any direct or indirect ownership interest; or (iii) the date on which you cease to be an owner of Franchisee or your spouse ceases to be an owner of Franchisee, as applicable.

"*Restricted Territory*" means the geographic area within: (i) your Territory; and (ii) any territory operated by us or another CarePatrol franchisee as of the beginning of the Post-Term Restricted Period (we will provide you with a description of all such territories upon your written request); provided, however, that if a court of

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

competent jurisdiction determines that the foregoing Restricted Territory is too broad to be enforceable, then the "Restricted Territory" means the geographic area within your Territory.

*"System"* means our unique system for the operation of a CarePatrol business, the distinctive characteristics of which include logo, trade secrets, concept, style, methods of internet usage, marketing programs, proprietary programs and products, confidential brand standards manual and operating system.

**2. Background.** In your capacity as an owner of Franchisee, or the spouse of an owner of Franchisee, you may gain knowledge of our System and Know-how. You understand that protecting the Intellectual Property is vital to our success and that of our franchisees and that you could seriously jeopardize our entire franchise system if you were to unfairly compete with us. In addition, you understand that certain terms of the Franchise Agreement apply to "owners" and not just Franchisee. You agree to comply with the terms of this Agreement In order to: (i) avoid damaging our System by engaging in unfair competition; and (ii) bind yourself to the terms of the Franchise Agreement applicable to owners.

**3. Brand Protection Covenants.**

(a) <u>Intellectual Property</u>. You agree: (i) you will not use the Know-how in any business or capacity other than the CarePatrol business operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer an owner of Franchisee or your spouse is an owner of Franchisee, as applicable. You further agree that you will not use the Intellectual Property for any purpose other than the development and operation of Franchisee's CarePatrol business pursuant to the terms of the Franchise Agreement and Manual. You agree to assign to us or our designee, without charge, all rights to any Improvement developed by you, including the right to grant sublicenses. If applicable law precludes you from assigning ownership of any Improvement to us, then such Improvement shall be perpetually licensed by you to us free of charge, with full rights to use, commercialize, and sublicense the same.

(b) <u>Unfair Competition During Relationship</u>. You agree not to unfairly compete with us at any time while you are an owner of Franchisee or while your spouse is an owner of Franchisee, as applicable, by engaging in any Prohibited Activities. In addition, to avoid any conflict of interest, you may not hold any ownership interest in a senior care facility or home care agency while you are an owner of Franchisee or while your spouse is an owner of Franchisee, as applicable.

(c) <u>Unfair Competition After Relationship</u>. You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within or provides competitive goods or services to Customers who are located within the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity (any such extension of time will not be construed as a waiver of your breach or otherwise impair any of our rights or remedies relating to your breach).

(d) <u>Immediate Family Members</u>. You acknowledge that you could circumvent the purpose of this Agreement by disclosing Know-how to an immediate family member (i.e., parent, sibling, child, or grandchild). You also acknowledge that it would be difficult for us to prove whether you disclosed the Know-how to family members. Therefore, you agree that you will be presumed to have violated the terms of this Agreement if any member of your immediate family (i) engages in any Prohibited Activities during any period of time during which you are prohibited from engaging in the Prohibited Activities or (ii) uses or discloses the Know-how. However,

you may rebut this presumption by furnishing evidence conclusively showing that you did not disclose the Know-how to the family member.

(e) **Covenants Reasonable**. You acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; and (ii) you have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. **YOU HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS AGREEMENT AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.** Although you and we both believe that the covenants in this Agreement are reasonable in terms of scope, duration and geographic are, we may at any time unilaterally modify the terms of the system protection covenants in Section 3 of this Agreement, upon written notice to you, by limiting the scope of the Prohibited Activities, narrowing the definition of a Competitive Business, shortening the duration of the Restricted Period, reducing the geographic scope of the Restricted Territory and/or reducing the scope of any other covenant imposed upon you under Section 3 of this Agreement to ensure that the terms and covenants are enforceable under applicable law

(f) **Breach**. You agree that failure to comply with the covenants in this Section 3 will cause substantial and irreparable damage to us and/or other CarePatrol franchisees for which there is no adequate remedy at law. Therefore, you agree that any violation of these covenants will entitle us to injunctive relief. You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Section are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages.

**4. Transfer Restrictions.** If you are an owner of Franchisee, you acknowledge that we must approve all persons who hold a direct or indirect ownership interest in Franchisee. Accordingly, you agree that you will not, directly or indirectly or by operation of law, sell, assign, mortgage, pledge or in any manner transfer any direct or indirect ownership interest in Franchisee except in accordance with the terms and conditions set forth in Section 19 of the Franchise Agreement.

**5. Financial Security.** In order to secure Franchisee's financial obligations under the Franchise Agreement and all ancillary agreements executed by Franchisee in connection with the Franchise Agreement, including, but not limited to, any agreement for the purchase of goods or services from us or an affiliate of ours and any promissory note related to payments owed to us (collectively, the "Secured Agreements"), you, jointly and severally, personally and unconditionally: (a) guarantee to us and our successor and assigns, that Franchisee shall punctually fulfil all of its payment and other financial obligations under the Secured Agreement; and (b) agree to be personally bound by, and personally liable for, each and every monetary provision in the Secured Agreements. You waive: (1) acceptance and notice of acceptance by us of the foregoing undertakings; (2) notice of demand for payment of any indebtedness guaranteed; (3) protest and notice of default to any party with respect to the indebtedness guaranteed; (4) any right you may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) the defense of the statute of limitations in any action hereunder or for the collection of any indebtedness hereby guaranteed. You agree that: (1) your direct and immediate liability under this guaranty shall be joint and several with Franchisee and all other signatories to this Agreement; (2) you will render any payment required under the Secured Agreements upon demand if Franchisee fails or refuses punctually to do so; (3) your liability shall not be contingent or conditioned upon pursuit by us of any remedies against Franchisee or any other person; and (4) liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence that we may grant to Franchisee or to any other person, including the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guarantee, which shall be continuing and irrevocable during the term of each of the Secured Agreements and following the termination, expiration or transfer of each of the Secured

Agreements to the extent any financial obligations under any such Secured Agreements survive such termination, expiration or transfer. This guaranty will continue unchanged by the occurrence of any bankruptcy with respect to Franchisee or any assignee or successor of Franchisee or by any abandonment of one or more of the Secured Agreements by a trustee of Franchisee. Neither your obligation to make payment in accordance with the terms of this undertaking nor any remedy for enforcement shall be impaired, modified, changed, released or limited in any manner whatsoever by any impairment, modification, change, release or limitation of the liability of Franchisee or its estate in bankruptcy or of any remedy for enforcement, resulting from the operation of any present or future provision of the U.S. Bankruptcy Act or other statute, or from the decision of any court or agency.

**6. Dispute Resolution.** Any dispute between the parties relating to this Agreement shall be brought in accordance with the dispute resolution procedures set forth in the Franchise Agreement. Notwithstanding the foregoing, if any of the dispute resolution procedures set forth in the Franchise Agreement conflict with any of the terms of this Agreement, the terms of this Agreement shall prevail. **You acknowledge and agree that a breach of this Agreement by you shall constitute a material event of default under the Franchise Agreement, permitting us to terminate the Franchise Agreement in accordance with the terms thereof.**

**7. Miscellaneous.** If either party hires an attorney or files suit against the other party in relating to an alleging a breach of this Agreement, the losing party agrees to pay the prevailing party's reasonable attorneys' fees and costs incurred in connection with such breach.

(a)     This Agreement will be governed by, construed and enforced under the laws of Arizona and the courts in that state shall have jurisdiction over any legal proceedings arising out of this Agreement.

(b)     Any claim, defense or cause of action that you may have against us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement.

(c)     Each section of this Agreement, including each subsection and portion thereof, is severable. In the event that any section, subsection or portion of this Agreement is unenforceable, it shall not affect the enforceability of any other section, subsection or portion; and each party to this Agreement agrees that the court may impose such limitations on the terms of this Agreement as it deems in its discretion necessary to make such terms reasonable in scope, duration and geographic area.

(d)     You agree that we may deliver to you any notice or other communication contemplated by this Agreement in the same manner and to the same address listed in the notice provisions of the Franchise Agreement and any such delivery shall be deemed effective for purposes of this Agreement. You may change the address to which notices must be sent by sending us a written notice requesting such change, which notice shall be delivered in the manner and to the address listed in the Franchise Agreement.

[Signature Page Follows]

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date or dates set forth below.

**OWNER / SPOUSE**

By: _____

Name: Hercules Bothma

Date: 4/22/2019


**OWNER / SPOUSE**

By: _____

Name: Michaela Kulbartz

Date: 4/22/2019


**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____


**OWNER / SPOUSE**

By: _____

Name: _____

Date: _____

# ATTACHMENT "C"

## TO FRANCHISE AGREEMENT

## ACH Authorization Form

*[See Attached]*

## AUTOMATED CLEARING HOUSE PAYMENT AUTHORIZATION FORM

**Franchisee Information:**

Franchisee Name                                                     Business No.

Franchisee Mailing Address (street)                                 Franchisee Phone No.

Franchisee Mailing Address (city, state, zip)

Contact Name, Address and Phone number (if different from above)

Franchisee Fax No.                                                  Franchisee E-mail Address

**Bank Account Information:**

Bank Name

Bank Mailing Address (street, city, state, zip)

☐ Checking  ☐ Savings

Bank Account No.               (check one)                          Bank Routing No. (9 digits)

Bank Phone No.

**Authorization:**

Franchisee hereby authorizes CarePatrol Franchise Systems, LLC ("Franchisor") to initiate debit entries to Franchisee's account with the Bank listed above and Franchisee authorizes the Bank to accept and to debit the amount of such entries to Franchisee's account. Each debit shall be made from time to time in an amount sufficient to cover any fees payable to Franchisor pursuant to any agreement between Franchisor and Franchisee as well as to cover any purchases of goods or services from Franchisor or any affiliate of Franchisor. Franchisee agrees to be bound by the National Automated Clearing House Association (NACHA) rules in the administration of these debit entries. Debit entries will be initiated only as authorized above. This authorization is to remain in full force and effect until Franchisor has received written notification from Franchisee of its termination in such time and in such manner as to afford Franchisor and the Bank a reasonable opportunity to act on it. Franchisee shall notify Franchisor of any changes to any of the information contained in this authorization form at least 30 days before such change becomes effective.

Signature:_____          Date:_____

Name:_____

Its:_____

Federal Tax ID Number:_____

## NOTE: FRANCHISEE MUST ATTACH A VOIDED CHECK RELATING TO THE BANK ACCOUNT.

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# ATTACHMENT "D"

## TO FRANCHISE AGREEMENT

### B<small>RAND</small> P<small>ROTECTION</small> A<small>GREEMENT</small>

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# BRAND PROTECTION AGREEMENT

This Agreement (this "Agreement") is entered into by the undersigned ("you") in favor of CarePatrol Franchise Systems, LLC, a Delaware limited liability company, and its successors and assigns ("us"), upon the terms and conditions set forth in this Agreement.

1. **Definitions.** For purposes of this Agreement, the following terms have the meanings given to them below:

"*Competitive Business*" means any business that provides senior referral and placement services similar to or competitive with the services offered by CarePatrol businesses.

"*Copyrights*" means all works and materials for which we or our affiliate has secured common law or registered copyright protection and that we allow CarePatrol franchisees to use, sell or display in connection with the marketing and/or operation of a CarePatrol business, whether now in existence or created in the future.

"*Franchisee*" means the CarePatrol franchisee for whom you are a manager, officer, director, employee or independent contractor.

"*Improvements*" means any additions, modifications or improvements to (i) the goods or services offered at a CarePatrol business, (ii) the method of operation of a CarePatrol business or (iii) any marketing or promotional ideals relating to a CarePatrol business, whether developed by you, Franchisee or any other person.

"*Intellectual Property*" means, collectively or individually, our Marks, Copyrights, Know-how, System and Improvements.

"*Know-how*" means all of our trade secrets and other proprietary information relating to the development, construction, marketing and/or operation of a CarePatrol business, including, but not limited to, methods, techniques, specifications, procedures, policies, marketing strategies and information comprising the System and the Manual.

"*Manual*" means our confidential brand standards manual for the operation of a CarePatrol business.

"*Marks*" means the logotypes, service marks, and trademarks now or hereafter involved in the operation of a CarePatrol business, including "CarePatrol," and any other trademarks, service marks or trade names that we designate for use in a CarePatrol business.

"*Prohibited Activities*" means any or all of the following: (i) owning, operating or having any other interest (as an owner, partner, director, officer, employee, manager, consultant, shareholder, creditor, representative, agent or in any similar capacity) in a Competitive Business (other than owning an interest of five percent (5%) or less in a publicly traded company that is a Competitive Business); (ii) diverting or attempting to divert any business from us (or one of our affiliates or franchisees); and/or (iii) inducing (a) any of our employees or managers (or those of our affiliates or franchisees) to leave their position or (b) any client of ours (or of one of our affiliates or franchisees) to transfer their business to you or to any other person that is not then a franchisee of ours.

"*Restricted Period*" means the one (1) year period after you cease to be a manager, officer, director, employee or independent contractor of Franchisee.

"*Restricted Territory*" means the geographic area attached hereto as Attachment A.

"*System*" means our unique system for the operation of a CarePatrol business, the distinctive characteristics of which include logo, trade secrets, concept, style, methods of internet of usage, marketing programs, proprietary programs and products, confidential brand standards manual and operating system.

2. **Background.** You are a manager, officer, director, employee or independent contractor of Franchisee. As a result of this association, you may gain knowledge of our System and Know-how. You understand that protecting the Intellectual Property is vital to our success and that of our franchisees and that you could seriously jeopardize our entire franchise system if you were to unfairly compete with us. In order to avoid such damage, you agree to comply with the terms of this Agreement.

3. **Intellectual Property**. You agree: (i) you will not use the Know-how in any business or capacity other than

the CarePatrol business operated by Franchisee; (ii) you will maintain the confidentiality of the Know-how at all times; (iii) you will not make unauthorized copies of documents containing any Know-how; (iv) you will take such reasonable steps as we may ask of you from time to time to prevent unauthorized use or disclosure of the Know-how; and (v) you will stop using the Know-how immediately if you are no longer a manager, officer, director, employee or independent contractor of Franchisee. You further agree that you will not use the Intellectual Property for any purpose other than the performance of your duties for Franchisee and within the scope of your employment or other engagement with Franchisee.

**4. Unfair Competition During Relationship**. You agree not to unfairly compete with us at any time while you are a manager, officer, director, employee or independent contractor of Franchisee by engaging in any Prohibited Activities. In addition, to avoid any conflict of interest, you may not hold any ownership interest in a senior care facility or home care agency while you are a manager, officer, director, employee or independent contractor of Franchisee.

**5. Unfair Competition After Relationship**. You agree not to unfairly compete with us during the Restricted Period by engaging in any Prohibited Activities; provided, however, that the Prohibited Activity relating to having an interest in a Competitive Business will only apply with respect to a Competitive Business that is located within or provides competitive goods or services to clients who are located within the Restricted Territory. If you engage in any Prohibited Activities during the Restricted Period, then you agree that your Restricted Period will be extended by the period of time during which you were engaging in the prohibited activity.

**6. Immediate Family Members**. You acknowledge that you could circumvent the purpose of this Agreement by disclosing Know-how to an immediate family member (i.e., spouse, parent, sibling, child, or grandchild). You also acknowledge that it would be difficult for us to prove whether you disclosed the Know-how to family members. Therefore, you agree that you will be presumed to have violated the terms of this Agreement if any member of your immediate family (i) engages in any Prohibited Activities during any period of time during which you are prohibited from engaging in the Prohibited Activities or (ii) uses or discloses the Know-how. However, you may rebut this presumption by furnishing evidence conclusively showing that you did not disclose the Know-how to the family member.

**7. Covenants Reasonable**. You acknowledge and agree that: (i) the terms of this Agreement are reasonable both in time and in scope of geographic area; and (ii) you have sufficient resources and business experience and opportunities to earn an adequate living while complying with the terms of this Agreement. YOU HEREBY WAIVE ANY RIGHT TO CHALLENGE THE TERMS OF THIS AGREEMENT AS BEING OVERLY BROAD, UNREASONABLE OR OTHERWISE UNENFORCEABLE.

**8. Breach**. You agree that failure to comply with the terms of this Agreement will cause substantial and irreparable damage to us and/or other CarePatrol franchisees for which there is no adequate remedy at law. Therefore, you agree that any violation of the terms of this Agreement will entitle us to injunctive relief. You agree that we may apply for such injunctive relief, without bond, but upon due notice, in addition to such further and other relief as may be available at equity or law, and the sole remedy of yours, in the event of the entry of such injunction, will be the dissolution of such injunction, if warranted, upon hearing duly held (all claims for damages by reason of the wrongful issuance of any such injunction being expressly waived hereby). If a court requires the filing of a bond notwithstanding the preceding sentence, the parties agree that the amount of the bond shall not exceed $1,000. None of the remedies available to us under this Agreement are exclusive of any other, but may be combined with others under this Agreement, or at law or in equity, including injunctive relief, specific performance and recovery of monetary damages. Any claim, defense or cause of action that you may have against us or against Franchisee, regardless of cause or origin, cannot be used as a defense against our enforcement of this Agreement.

## 9. Miscellaneous.

(e)     If we hire an attorney or file suit against you because you have breached this Agreement and prevail against you, you agree to pay our reasonable attorneys' fees and costs in doing so.

(f)     This Agreement will be governed by, construed and enforced under the laws of the State of Arizona and the courts in that state shall have jurisdiction over any legal proceedings arising out of this Agreement.

(g)     Each section of this Agreement, including each subsection and portion thereof, is severable. In the event that any section, subsection or portion of this Agreement is unenforceable, it shall not affect the enforceability of any other section, subsection or portion; and each party to this Agreement agrees that the court may impose such limitations on the terms of this Agreement as it deems in its discretion necessary to make such terms reasonable in scope, duration and geographic area.

(h)     You and we both believe that the covenants in this Agreement are reasonable in terms of scope, duration and geographic area. However, we may at any time unilaterally modify the terms of this Agreement upon written notice to you by limiting the scope of the Prohibited Activities, narrowing the definition of a Competitive Business, shortening the duration of the Restricted Period, reducing the geographic scope of the Restricted Territory and/or reducing the scope of any other covenant imposed upon you under this Agreement to ensure that the terms and covenants in this Agreement are enforceable under applicable law.

[Signature Page Follows]

This Brand Protection Agreement is executed as of the date or dates set forth below.

**RESTRICTED PARTY**

By: _____

Name: _____

Date: _____

By signing below, I hereby affirm that I witnessed the person named above execute this Agreement on the date set forth below his or her name.

**WITNESS**

By: _____

Name: _____

Date: _____

**RESTRICTED PARTY**

By: _____

Name: _____

Date: _____

By signing below, I hereby affirm that I witnessed the person named above execute this Agreement on the date set forth below his or her name.

**WITNESS**

By: _____

Name: _____

Date: _____

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# ATTACHMENT "E"

# TO FRANCHISE AGREEMENT

### HIPAA BUSINESS ASSOCIATE AGREEMENT

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

## THE CAREPATROL HIPAA BUSINESS ASSOCIATE AGREEMENT
## (45 CFR §164.504(e))

This BUSINESS ASSOCIATE Agreement (the "BA Agreement") is made this ___4/22/2019___,
by and between ___Sustained Care Services, LLC___ (hereinafter "COVERED ENTITY").

### AND

CarePatrol Franchise Systems, LLC hereinafter 'BUSINESS ASSOCIATE", with its principal place of business located at 1760 East Pecos Road, Suite 338, Gilbert, Arizona 85295.

### Recitals

A. BUSINESS ASSOCIATE performs, or assists in the performance of, a function or activity or provides services of a type for COVERED ENTITY that makes BUSINESS ASSOCIATE a "business associate" for purposes of the HIPAA Privacy Regulations. {45 CFR §160.103}

B. COVERED ENTITY will disclose Protected Health Information to BUSINESS ASSOCIATE in conjunction with the function, activity or services performed or provided by BUSINESS ASSOCIATE. {45 CFR §160.103}

C. COVERED ENTITY will disclose electronic health information to BUSINESS ASSOCIATE in conjunction with the function, activity or services performed or provided by BUSINESS ASSOCIATE.

D. COVERED ENTITY and BUSINESS ASSOCIATE desire to enter into a BA Agreement as required by the HIPAA Privacy and Security Regulations to provide satisfactory assurance to COVERED ENTITY that BUSINESS ASSOCIATE will appropriately safeguard that Protected Health Information. {45 CFR §164.502(e)(l)}

### Agreement

NOW THEREFORE, COVERED ENTITY and BUSINESS ASSOCIATE agree as follows:

1.      **Definitions.**   The following terms are defined as set forth below. Any terms used but not otherwise defined in this BA Agreement have the definitions set forth in the Regulations and the Health Information Technology for Economic and Clinical Health Act ("HITECH"), found in Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-005, and any regulations promulgated thereunder.

   a.   "Breach" shall have the meaning set forth in 45 C.F.R. § 164.402.b. "Electronic Protected Health Information" shall mean individually identifiable health information that is transmitted by or maintained by electronic media. It includes devices in computers and any removable/transportable digital memory medium. Transmission media include the internet, extranet or intranet, leased lines, dial-up lines, private networks, and physical movement of removable/transportable media. Certain transmissions, including of paper, via facsimile, and of voice, via telephone, are not considered to be transmissions via electronic media if the information being exchanged did not exist in electronic form immediately before the transmission. {45 CFR §160.103}

   c.   "HIPAA Privacy Regulations" shall mean the regulations at 45 CFR §160 and §164, subparts A and E.

   d.   "HIPAA Security Regulations" shall mean the regulations at 45 CFR §160 and §164, subpart C.

e.  "HIPAA Breach Notification Rule" shall mean the regulations at 45 CFR §164, subpart D.

f.  "HIPAA Rules" shall mean the HIPAA Privacy Regulations, the HIPAA Security Regulations, the HIPAA Breach Notification Rule and the HIPAA enforcement rule at 45 CFR §160, subpart C.

g.  "Individual" shall have the same meaning as the term "individual" in 45 C.F.R. § 160.103 and shall include a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

h.  "Protected Health Information" or "PHI" means, subject to the definition provided at 45 C.F.R. § 160.103, individually identifiable health information that BUSINESS ASSOCIATE receives from COVERED ENTITY or creates, receives, transmits or maintains on behalf of COVERED ENTITY for purposes of performing the services under the Engagement. Unless otherwise stated in this BA Agreement, any provision, restriction or obligation in this BA Agreement related to the use of PHI shall apply equally to EPHI.

i.  "Regulations" shall mean collectively the HIPAA Security Regulations, the HIPAA Privacy Regulations, the HIPAA Breach Notification Rule and the HIPAA enforcement rule at 45 CFR §160, subpart C.

j.  "Required by Law" shall have the same meaning as the term "required by law" in 45 C.F.R. § 164.103.

k.  "Secretary" shall mean the Secretary of the Department of Health and Human Services or their designee.

l.  "Security Incident" means the attempted or successful unauthorized access, use, disclosure, modification or destruction of information or interference with the system operations in an information system. {45 CFR §164.304}

m.  "Subcontractor" means a person to whom a business associate delegates a function, activity or service, other than in the capacity of a member of the workforce of such business associate.

n.  "Unsecured Protected Health Information" means Protected Health Information that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use of a technology or methodology specified by the Secretary. {45 CFR 164.402}

BUSINESS ASSOCIATE acknowledges and agrees that all PHI that is created or received by COVERED ENTITY and disclosed or made available in any form by COVERED ENTITY to BUSINESS ASSOCIATE, or is created, received, maintained or transmitted by BUSINESS ASSOCIATE on COVERED ENTITY's behalf, will be subject to this BA Agreement. This BA Agreement will commence upon the Effective Date and will continue as long as BUSINESS ASSOCIATE has use, custody or access to PHI subject to this BA Agreement, and thereafter for the period required by the Regulators.

2.  **Restriction on Use and Disclosure of Protected Health Information.** Except as permitted or required by this BA Agreement or as required by law, BUSINESS ASSOCIATE shall not use, de-identify, or further disclose any Protected Health Information disclosed or otherwise made available to it by COVERED ENTITY. {45 CFR §164.504(e)(2)(i) and (e)(2)(ii)(A)}

3.  **Authorized Uses and** Disclosures. Except as otherwise limited in this BA Agreement, BUSINESS ASSOCIATE is hereby authorized to use and disclose Protected Health Information for the following purposes:

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

a. *Generally.* BUSINESS ASSOCIATE may use or disclose Protected Health Information on behalf of, or to provide services to, COVERED ENTITY for the following purposes, if such use or disclosure of Protected Health Information would not violate the HIPAA Privacy Regulations if done by COVERED ENTITY or the minimum necessary policies and procedures of COVERED ENTITY: Provide ongoing assistance with the operations of the COVERED ENTITY's franchised business. {45 CFR §164.504(e)(2)}

b. *Management* and *Administration.* BUSINESS ASSOCIATE may use and disclose Protected Health Information for the proper management and administration of BUSINESS ASSOCIATE or to carry out the legal responsibilities of BUSINESS ASSOCATE, provided:

    I. The disclosure is required by law; or,

    II. BUSINESS ASSOCIATE obtains reasonable assurances from the person to whom the information is disclosed that it will be held confidentially and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person and the person will immediately notify the BUSINESS ASSOCIATE of any instances of which it is aware in which the confidentiality of the information has been breached. {45 CFR §164.504(e)(2)(i)(A) and 45 CFR §164.504(e)(4)}

c. *Violations of Law.* BUSINESS ASSOCIATE may use Protected Health Information to report violations of law to appropriate Federal and State authorities, consistent with 20 CFR §164.502(j)(l).

4. **BUSINESS ASSOCIATE'S Obligations.**

a. *Representation and Acknowledgment.* BUSINESS ASSOCIATE represents that is has complied and will comply with the requirements of the Regulations applicable to it and acknowledges that it is aware that it is subject to the civil and criminal penalties of section 1176 and 1177 of the Social Security Act.

b. Safeguards. BUSINESS ASSOCIATE shall use appropriate safeguards, and comply, where applicable, with the HIPAA Security Regulations with respect to electronic Protected Health Information, to prevent use or disclosure of Protected Health Information other than as permitted or required by this BA Agreement or as required by law. {45 CFR §164.504(e)(2)(ii)(B)}

c. *Security of Electronic Protected Health Information.* BUSINESS ASSOCIATE shall implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the electronic Protected Health Information that it creates, receives, maintains or transmits on behalf of COVERED ENTITY. {45 CFR §164.314(a)(2)(i)(A)}

d. *Reporting.* BUSINESS ASSOCIATE shall report to COVERED ENTITY any use or disclosure of Protected Health Information not permitted by this BA Agreement of which it becomes aware, including Breaches of Unsecured Protected Health Information as required by the HIPAA Breach Notification Rule.

e. *Subcontractors.* BUSINESS ASSOCIATE shall ensure that any subcontractors that create or receive Protected Health Information on behalf of BUSINESS ASSOCIATE agree to the same restrictions and conditions that apply to BUSINESS ASSOCIATE with respect to such information. {45 CFR §164.314(a)(2)(i)(B)}

f. *Providing Electronic Protected Health Information to Agents or Subcontractors.* BUSINESS ASSOCIATE shall ensure that any agent, including a subcontractor, to whom it provides electronic

Protected Health Information, agrees to implement reasonable and appropriate safeguards to protect the electronic Protected Health Information. {45 CFR §164.314(a)(2)(i)(B)}

g. *Individual's Access to Information.* BUSINESS ASSOCIATE shall make available and permit access to Protected Health Information about an individual by that individual in accordance with 45 CFR §164.524, {45 CFR §164.504(e)(2)(ii)(E)}

h. *Amendment of Protected Health Information.* BUSINESS ASSOCIATE shall make available to COVERED ENTITY Protected Health Information for amendment and incorporate any amendments to Protected Health Information in accordance with 45 CFR §164.526. {45 CFR §164.504(e)(2)(ii)(P)}

i. *Accounting of Disclosures.* BUSINESS ASSOCIATE shall document such disclosures of Protected Health Information and information related to such disclosures as would be required for COVERED ENTITY to respond to a request by an individual for an accounting of disclosures of Protected Health Information in accordance with 42 CFR §164.528.

BUSINESS ASSOCIATE shall make available the information required to provide an accounting of disclosures in accordance with 42 CFR §164.528. Such information shall be given to COVERED ENTITY by BUSINESS ASSOCIATE within 20 days after COVERED ENTITY notifies BUSINESS ASSOCIATE of COVERED ENTITY need for the information. {45 CFR §164.504(e)(2)(ii)(G)}

**5. COVERED ENTITY's Obligations.**

a. *Provisions for COVERED ENTITY to Inform BUSINESS ASSOCIATE of Privacy Practices and Restrictions.*

I. COVERED ENTITY shall notify BUSINESS ASSOCIATE of any limitation(s) in its Notice of Privacy Practices of COVERED ENTITY in accordance with 45 CFR §164.520, to the extent that such limitation may affect BUSINESS ASSOCIATE's use or disclosure of Protected Health Information.

b. *Permissible Requests by COVERED ENTITY.*

I. COVERED ENTITY shall not request BUSINESS ASSOCIATE to use or disclose protected health information in any manner that would not be permissible under the HIPAA privacy regulations if done by COVERED ENTITY.

**6. Breach Notification.**

a. *Notice to COVERED* ENTITY. BUSINESS ASSOCIATE will report to COVERED ENTITY any suspected Breach of Unsecured PHI by BUSINESS ASSOCIATE or any of its officers, directors, employees, Subcontractors or agents. All notifications required under this Section will be made by BUSINESS ASSOCIATE without unreasonable delay and in no event later than ten (10) days of discovery. BUSINESS ASSOCIATE will use the standard at 45 C.F.R. § 164.410(a) to determine when the suspected Breach is treated as discovered. COVERED ENTITY shall have discretion to determine whether a suspected Breach has given rise to a Breach. BUSINESS ASSOCIATE will cooperate with COVERED ENTITY and provide such information as COVERED ENTITY reasonably requires in making this determination. In notifying COVERED ENTITY of a suspected Breach, BUSINESS ASSOCIATE will provide, to the extent reasonably possible, as much of the information it has that would be required in notifying a COVERED ENTITY of a Breach, under 45 C.F.R. § 164.410. If COVERED ENTITY determines that a Breach has occurred, BUSINESS

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

ASSOCIATE will provide any other available information that COVERED ENTITY is required to include in its notification to individuals pursuant to 45 C.F.R. §164.404(c).

b. *Notice to Individuals and Media*. In the event COVERED ENTITY determines a Breach has occurred that was caused by the acts or omissions of BUSINESS ASSOCIATE, its Subcontractors, officers, directors, employees or agents, BUSINESS ASSOCIATE will cooperate with COVERED ENTITY to notify, (i) individuals whose Unsecured PHI has been, or is reasonably believed by COVERED ENTITY to have been, accessed, acquired, used or disclosed, and (ii) the media, as required pursuant to 45 C.F.R. § 164.406, if the legal requirements for media notification are triggered by the circumstances of such Breach. BUSINESS ASSOCIATE will cooperate in COVERED ENTITY's Breach analysis process and procedures, if requested. COVERED ENTITY will at all times have the final decision about the content of any notification required to be given under the Regulations.

c. *Proof of Encryption.* In the event of a Breach of Secured Protected Health Information, BUSINESS ASSOCIATE shall notify COVERED ENTITY of the Breach as stated in subparagraph (6)(a), above, and within 20 calendar days after giving such notice to COVERED ENTITY, provide proof satisfactory to COVERED ENTITY that such Protected Health Information was not Unsecured Protected Health Information. {42 CFR §164.402}

**7. Term and Termination.**

a. *Generally.* This BA Agreement shall be effective when executed on behalf of both of the parties hereto and shall terminate when all of the Protected Health Information provided by COVERED ENTITY to BUSINESS ASSOCIATE, or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY, is destroyed or returned to COVERED ENTITY, or, if it is not feasible to return or destroy Protected Health Information, protections are extended to such information, in accordance with the termination provisions in this Paragraph (7).

b. *Mutual Agreement.* This BA Agreement may be terminated by mutual written agreement of the parties.

c. *Termination for Cause.* Upon COVERED ENTITY's knowledge of a material breach of this BA Agreement by BUSINESS ASSOCIATE. COVERED ENTITY shall either:

   I. Provide an opportunity for BUSINESS ASSOCIATE to cure the breach or end the violation and terminate the BA Agreement if BUSINESS ASSOCIATE does not cure the breach or end the violation within the time specified by COVERED ENTITY;
   II. Immediate terminate the BA Agreement if BUSINESS ASSOCIATE has breached a material term of this BA Agreement and cure is not possible.

d. *Effect of Termination.*

   I. Except as provided in paragraph (2) below, upon termination of this BA Agreement for any reason, BUSINESS ASSOCIATE shall return or destroy all Protected Health Information received from COVERED ENTITY, or created or received by BUSINESS ASSOCIATE on behalf of COVERED ENTITY that BUSINESS ASSOCIATE maintains in any form. This provision also shall apply to Protected Health Information that is in the possession of subcontractors of BUSINESS ASSOCIATE. BUSINESS ASSOCIATE shall retain no copies of the Protected Health Information.

   II. In the event that BUSINESS ASSOCIATE determines that returning or destroying the protected information is not feasible, BUSINESS ASSOCIATE shall provide to COVERED

ENTITY notification of the conditions that make return or destruction not feasible. BUSINESS ASSOCIATE shall extend the protections of this BA Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction not feasible, for so long as BUSINESS ASSOCIATE maintains such Protected Health Information.

8. **Subpoena.** In the event BUSINESS ASSOCIATE receives a subpoena for any Protected Health Information in BUSINESS ASSOCIATE's possession, BUSINESS ASSOCIATE shall immediately notify COVERED ENTITY of the subpoena and deliver a copy of the subpoena to COVERED ENTITY. BUSINESS ASSOCIATE shall respond to the subpoena only in accordance with the HIPAA Privacy Regulations.

9. **Notices.** Any notices required or permitted to be given under this BA Agreement shall be in writing and shall be personally delivered or sent by certified or registered mail, first class postage prepaid, return receipt requested, or by prepaid overnight delivery services such that proof of delivery will be obtained, and shall be addressed as set forth below or to such other address as may be specified in a prior written notice to the other party: To those addresses indicated in the COVERED ENTITY'S Franchise Agreement with BUSINESS ASSOCIATE.

Such notice shall be deemed to be given on the date it is deposited in the mail as stated above, on the date it is given to the overnight delivery service or the date it is given personally to the party to whom it is directed. A notice shall be deemed to have been given personally to a party if it is handed to the representative of the party to whom the notice must be addressed or if left at his or her office located at the street address to which a notice would be mailed.

10. **Amendment.** This BA Agreement may not be changed, modified or amended except by a written agreement executed on behalf of each of the parties.

11. **No Waiver.** No waiver of one or more of the provisions of this BA Agreement or the failure to enforce any provision of this BA Agreement by either party shall be construed as a waiver of any subsequent breach of this BA Agreement, nor a waiver of the right at any time thereafter to require strict compliance with all of its terms.

12. **Entire Agreement.** This BA Agreement sets forth the entire agreement and understanding between the parties as to the matters contained in it, and supersedes all prior discussions, agreements and understandings of every kind and nature between them.

13. **Headings.** The headings placed between the various paragraphs and subparagraphs of this BA Agreement are inserted for ease of reference only, do not constitute a part of this BA Agreement, and shall not be used in any way whatsoever in the construction or interpretation of this BA Agreement.

14. **Interpretation.** Any ambiguity in this BA Agreement shall be resolved to permit COVERED ENTITY to comply with the HIPAA Privacy Rule, 45 CFR §164.500 et seq., the HIPAA Security Rule, 45 CFR §164.302 et seq, and the HIPAA Breach Notification Rule, 45 CFR §164.400 et seq., as each may be amended from time to time.

15. **Governing Law.** This BA Agreement shall be construed and enforce in accordance with, and governed by, the laws of the State of Arizona.

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

IN WITNESS WHEREOF, the parties hereto have caused this BA Agreement to be executed by their duly authorized representatives on the date set forth below.

BUSINESS ASSOCIATE/FRANCHISOR:

CarePatrol Franchise Systems, LLC
a Delaware limited liability company

By: _Stephen Greenwald_

Title: In-House Counsel

_____
Stephen D. Greenwald Esq.

COVERED ENTITY/FRANCHISEE:

Sustained Care Services, LLC
a Pennsylvania limited liability company

By: _____  /  _L. Kulbartz_

Title: President  /  VP, Secretary and Treasurer

_____
Hercules Bothma  /  Michaela Kulbartz

# EXHIBIT "D"

## TO DISCLOSURE DOCUMENT

### FRANCHISEE DISCLOSURE QUESTIONNAIRE

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

## Franchise Disclosure Questionnaire

Applicant      Hercules Bothma   &   Michaela Kulbartz

(If corporation) State of Incorporation

Address of Applicant

Location (Exclusive Area) Applied For

**1.** I have received all appropriate disclosure documents for the State(s) of ___Pennsylvania___ at least fourteen (14) calendar days, exclusive of the day I received them and the day I signed them, before signing the Franchise Agreement and/or payment of any monies.

**2.** I have signed and returned to CarePatrol Franchise Systems, LLC ("CarePatrol") the acknowledgment of receipt for each disclosure document given me.

**3.** I have had an opportunity to read the Franchise Agreement thoroughly and understand all of CarePatrol's covenants and obligations and my obligations as a franchisee of the CarePatrol system. I understand that the Franchise Agreement contains all obligations of the parties.

**4.** I understand that this franchise business, as in all business ventures, involves risk and despite assistance and support programs, the success of my business will depend primarily upon me and my ability.

**5.** Except for fill in the blank provisions or for negotiated changes that I initiated, I received a copy of the revised Franchise Agreement at least seven (7) calendar days before the date on which the Franchise Agreement was signed.

**6.** I understand that the franchise granted is for the right to operate a CarePatrol Business at the Authorized Location within the Exclusive Area only and that CarePatrol and its affiliates have the right to issue franchises or operate competing businesses for or at locations outside the Exclusive Area and engage in certain activities inside the Exclusive Area.

**7.** I understand that any training, support, guidance or tools CarePatrol provides to me as part of the Franchise System are for the purpose of protecting the CarePatrol brand and trademarks and to assist me in the operation of my business and not for the purpose of controlling or in any way intended to exercise or exert control over my decisions or day-to-day operations of my business, including my sole responsibility for hiring, wages and other compensation (including benefits), training, supervision and termination of my employees and all other employment and employee related matters.

**8.** I have had no promises, guarantees or assurances made to me and no information provided to me relative to earnings, revenues, profits, expenses or projected revenues for this franchise, except as disclosed in the disclosure document. If I believe that I have received any such promises, guarantees, assurances or information, I agree to describe it below (if left blank, your answer to this statement will be deemed as otherwise write "None").

Applicants' Acknowledgment:

Name: ___Hercules Bothma___        Name: ___Michaela Kulbartz___

Date: ___4/22/2019___        Date: ___4/22/2019___

©2018 CarePatrol Franchise Systems, LLC
2018 Franchise Disclosure Document – Exhibit "D"

**EXHIBIT "E"**

**TO DISCLOSURE DOCUMENT**

**G̲E̲N̲E̲R̲A̲L̲ ̲R̲E̲L̲E̲A̲S̲E̲**

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

# WAIVER AND RELEASE OF CLAIMS

This Waiver and Release of Claims (the "Release") is made as of _____ ___, 20___ by _____, a(n) _____ ("Franchisee"), and each individual holding an ownership interest in Franchisee (collectively with Franchisee, "Releasor") in favor of CarePatrol Franchise Systems, LLC, a Delaware limited liability company ("Franchisor," and together with Releasor, the "Parties").

**WHEREAS,** Franchisor and Franchisee have entered into a Franchise Agreement (the "Agreement") pursuant to which Franchisee was granted the right to own and operate a CarePatrol business;

**WHEREAS,** Franchisee has notified Franchisor of its desire to transfer the Agreement and all rights related thereto, or an ownership interest in Franchisee, to a transferee, **[enter into a renewal franchise agreement]** and Franchisor has consented to such transfer **[agreed to enter into a renewal franchise agreement]**; and

**WHEREAS,** as a condition to Franchisor's consent to the transfer **[Franchisee's ability to enter into a renewal franchise agreement]**, Releasor has agreed to execute this Release upon the terms and conditions stated below.

**NOW, THEREFORE,** in consideration of Franchisor's consent to the transfer **[Franchisor entering into a renewal franchise agreement]**, and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and intending to be legally bound, Releasor hereby agrees as follows:

1.      Representations and Warranties. Releasor represents and warrants that it is duly authorized to enter into this Release and to perform the terms and obligations herein contained, and has not assigned, transferred or conveyed, either voluntarily or by operation of law, any of its rights or claims against Franchisor or any of the rights, claims or obligations being terminated and released hereunder. [_____] represents and warrants that he/she is duly authorized to enter into and execute this Release on behalf of Franchisee. Releasor further represents and warrants that all individuals that currently hold a direct or indirect ownership interest in Franchisee are signatories to this Release.

2.      Release. Releasor and its subsidiaries, affiliates, parents, divisions, successors and assigns and all persons or firms claiming by, through, under, or on behalf of any or all of them, hereby release, acquit and forever discharge Franchisor, any and all of its affiliates, parents, subsidiaries or related companies, divisions and partnerships, and its and their past and present officers, directors, agents, partners, shareholders, employees, representatives, successors and assigns, and attorneys, and the spouses of such individuals (collectively, the "Released Parties"), from any and all claims, liabilities, damages, expenses, actions or causes of action which Releasor may now have or has ever had, whether known or unknown, past or present, absolute or contingent, suspected or unsuspected, of any nature whatsoever, including without limiting the generality of the foregoing, all claims, liabilities, damages, expenses, actions or causes of action directly or indirectly arising out of or relating to the execution and performance of the Agreement and the offer and sale of the franchise related thereto.

3.      Nondisparagement. Releasor expressly covenants and agrees not to make any false representation of facts, or to defame, disparage, discredit or deprecate any of the Released Parties or otherwise communicate with any person or entity in a manner intending to damage any of the Released Parties, their business or their reputation.

4.      Miscellaneous.

    a.          Releasor agrees that it has read and fully understands this Release and that the opportunity has been afforded to Releasor to discuss the terms and contents of said Release with legal counsel and/or that such a discussion with legal counsel has occurred.

    b.          This Release shall be construed and governed by the laws of the State of Arizona.

       c.        Each individual and entity that comprises Releasor shall be jointly and severally liable for the obligations of Releasor.

       d.        In the event that it shall be necessary for any Party to institute legal action to enforce or for the breach of any of the terms and conditions or provisions of this Release, the prevailing Party in such action shall be entitled to recover all of its reasonable costs and attorneys' fees.

       e.        All of the provisions of this Release shall be binding upon and inure to the benefit of the Parties and their current and future respective directors, officers, partners, attorneys, agents, employees, shareholders and the spouses of such individuals, successors, affiliates, and assigns. No other party shall be a third-party beneficiary to this Release.

       f.        This Release constitutes the entire agreement and, as such, supersedes all prior oral and written agreements or understandings between and among the Parties regarding the subject matter hereof. This Release may not be modified except in a writing signed by all of the Parties. This Release may be executed in multiple counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same document.

       g.        If one or more of the provisions of this Release shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect or impair any other provision of this Release, but this Release shall be construed as if such invalid, illegal or unenforceable provision had not been contained herein.

       h.        The Parties agree to do such further acts and things and to execute and deliver such additional agreements and instruments as any Party may reasonably require to consummate, evidence, or confirm the Release contained herein in the matter contemplated hereby.

       i.        This Release does not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

*[Signature Page Follows]*

**IN WITNESS WHEREOF** Releasor has executed this Release as of the date first written above.

**FRANCHISEE**

_____ , a

_____

By:_____

Name: _____

Its: _____

**FRANCHISEE'S OWNERS**

Date  _____        _____

Signature

_____

Typed or Printed Name

**EXHIBIT "H"**

**TO DISCLOSURE DOCUMENT**

<u>**RECEIPTS**</u>

*[See Attached]*

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary
REDACTED - Confidential and Proprietary

DocuSign Envelope ID: 6E2B24D3-AB3F-4B2C-808D-892B40EB006F

<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>
<span style="color:red">REDACTED - Confidential and Proprietary</span>